Dissenting Opinion.
Manning, O. J.
I do not concur in the opinion of my brethren, and shall state .the reasons of my dissent as briefly as the nature of the case will permit.
The main question is the alleged unconstitutionality of the 37th. section of the act of 1852, as violative of the constitutional requirement that taxation shall be equal and uniform. The argument is, that the legislative order to levy a special tax on real estate and slaves, (which last may be eliminated from our consideration now) and not on personalty, is a prohibited discrimination to the detriment of the former; and that the levy of any tax on an antiquated assessment, which does not, represent the shifting values of a growing and ever changing city, is illegal, because unequal and not uniform. The relator meets this objection with a denial that the constitutional mandate refers to municipal taxation, and invokes the decisions of this court as supporting and maintaining the doctrine that reference was had to State taxes alone.
The leading case is Duncan’s, 2 Annual, 182, where the Second Municipality had imposed a special tax of one 'per centum on all real estate-within its limits, and the Court said, replying to the objection that it was-unconstitutional because in conflict with art. 127 of the constitution of 1845 ; — “ That article, by its very terms, applies to State, and not to municipal taxes. It provides for the equality and uniformity of taxation throughout the State. * * * The framers of this constitution had before them the condition of the municipalities of New Orleans, with their debts, their abuses, and their wants ; and their corporate existence-is recognized and continued as to certain public rights by an express provision. The jurisprudence under which the present system of taxation had grown up, was before them, and the power of remedying the-, evils of misgovernment was left in statu quo with the legislature, and *25 the convention confined itself to providing for the State government, leaving the municipal bodies, as it is believed sound policy justified, under legislative control.”
This judicial declaration is entitled to th^ greater weight from the fact that the then Chief Justice, who delivered the Opinion of the Court, was one of the framers of that constitution, whose provisions he was expounding. That decision was rendered in 1847, and although it is said, the case originated before the taxation clause of the constitution of 1845 went into full effect, the same court approved and re-affirmed it by name- and in express terms in Lafayette v. Cummins, 3 Annual, 674, and Buffington v. Dinkgrave, 4 Annual, 549. These decisions were in 1848 and 1849, and the principle had become a rule of property when the consolidation act of 1852 was passed, and the bonds of the relator were issued. Nor is it unimportant to note in this connection that the courts of Virginia and Arkansas, whose constitutions contained an identical article-with ours, ruled in the same way. Gilkerson v. Frederick, 13 Gratt. 577. Washington v. the State, 13 Ark. 351.
The constitution of 1852 reproduced this requirement touching the-equality and uniformity of taxation, (art. 123) and in 1854 the court organized under that constitution had occasion for the first time to construe it. The doctrine of Duncan’s case was abandoned, the court being divided in opinion. The Second Municipality had imposed a tax on the owners of real estate contiguous to Benton street, to pay the expense of opening it, and the court said, there was no other mode of apportioning-a tax for such improvements which will be equal and uniform but that-of an ad valorem tax on all property holders within the district, or by paying the expenses out of the funds derived from general taxation, and the tax on the real estate contiguous to the street was held invalid and unconstitutional. There were two dissentents, Slidell G. J. saying, he-considered the decision in Duncan’s ease as settled doctrine, and no longer res nova. White’s case, 9 Annual, 446. It is now said that the opinion in Duncan’s case, so far as it treats of the constitutional mandate of 1845, ip obiter. Slidell J. was a member of that court and concurred in the opinion, as did every member of that court, and after seven years of reflection, being also on the new bench, he was unable to discover in what-respect it was obiter, and not only adhered to it, but declared, he did not consider the question any longer an open one.
It was not long however before the question was again presented broadly, and one of the two conflicting dicta had to be abandoned. In Yeatman v. Crandell XI Annual, 220, after quoting the article of the two constitutions, the court say; — “ This article refers to State taxation in its proper sense, for general or State purposes. When it says that taxation shall be equal and uniform throughout the State, it points. *26 directly to its object, which is to regulate the mode of filling the State Treasury. It does not take away the power of making local assessments for local improvements. * * -x' * It is notorious that an acre of land pays twice as great a tax*for local purposes in one parish as an acre of equal value pays in another parish. Yet no one thinks the constitution infringed by such a state of things. It is enough that State taxes for ■State purposes are equal and uniform, and ad valorem,”
White’s case was thus overruled, and the doctrine of the earlier case was re-affirmed without dissent, one of the Justices who formed part of the majority in that ease having renounced his former opinion and saying ; — “ I yield my former impressions on this point the more readily because the Supreme court which sat under the constitution of 1845, and five of the seven judges with whom I have sat upon this bench, have concurred in holding that the article in question was not intended to ■apply to municipal or local taxation for local improvements.” The following year the decision in Yeatman v. Crandell was re-affirmed in Jamison v. New Orleans, 12 Annual, 846, and again in Wallace v. Shelton, 14 Annual, 498, in which last case the court say; — “ When the different municipalities were consolidated into one city, the legislature adopted the principle that it was equal and just that the city at large should pay the very unequal debts of the different municipalities. It was not in the power of this Court to say that the legislation was unconstitutional.”
There is therefore no doubt — there can be none — about the Judicial construction of the constitutional requirement of uniformity and equality of taxation. It may be argued that it was an erroneous construction, but that it was the actual construction, made by two courts interpreting identical articles in two constitutions, has been shewn by producing the language of those Courts. Nor can it be said that the question had not proper consideration. It was not settled without controversy, and the circumstances attending the decision in Yeatman’s case impart great weight tp the manner in which White’s case was overruled, and evince -the deliberation which attended the unanimous re-establishment of the earlier doctrine, that municipal taxation was not referred to, nor included In, the constitutional prohibition of inequality of taxation. And if so, -then the 87th. section of the Act of 1852 is not open to the objection of unconstitutionality made by the defendant, because it deals with municipal taxation alone.
The action of the legislative department of the government was in ■accordance with this judicial construction. From the passage of the Act of 1852, the requirement for a levy of the tax to pay the interest on -the Consolidated Bonds, was complied with. In 1856 the charter of New Orleans was amended, and the essential provisions of the act of 1852 were re-enacted, and those touching the levy and collection of this tax *27 were retained, and the assurances of its security and regular payment were renewed. The common council were directed to lay an equal and uniform tax upon all property real and personal in the city for the purposes of the Act — that is to say for the purpose of providing general revenues etc. — but said tax, added to the Consolidated Loan tax, and to certain other specified taxes, shall not exceed in the aggregate one dollar and fifty cents on one hundred dollars of valuation. Sess. Acts 1856, pp. 148,162, secs. 42,117. The manner of levying the tax for the Consolidated Loan, as fixed by the 37th. sec. of the Act of 1852, was not interfered with nor changed. That tax was to be levied as heretofore, and when added to the general equal and uniform tax which was to be levied on all property for other purposes, the aggregate was not to exceed a specified rate.
There was never a year when this Consolidated Loan tax was not collected, although the mode of its assessment was altered. In 1870 another charter was granted to New Orleans, and all the rights of the Consolidated Bond holders, secured to them by previous legislation, were recognized, and the collection of the tax for their payment was provided for. Sess. Acts 1870, pp. 44, 48 secs. 34, 44. And in 1874 the “ validity of the consolidated bonds of New Orleans is recognized in all its integrity ” by a solemn legislative declaration. Sess. Acts, p. 92. It was not until 1876, after the annual tax for the payment of the Consolidation Loan interest had been uninterruptedly laid'for twenty years, that the General Assembly undertook to deprive the holders of the consolidated debt of all the means of procuring, or of enforcing payment of their bonds, or the interest upon them.
Meanwhile, in 1875, a suit had been instituted in the U. S. Circuit court by holders of the Consolidated bonds against the city, for the purpose of establishing their debt, and to compel a specific performance of the contract between themselves and the city, which they alleged grew out of and was contained in the 37th. sec. of the Act of 1852. They sought to have their position as creditors first in order, and, entitled to preference in payment out of the taxes levied upon lands, determined by a decree of court. The unconstitutionality of the act of 1852 was pleaded by the city, but the Circuit court affirmed its validity, and declared that the 37th. section constituted a contract between the City and the Consolidated bondholders, which could not be impaired, and that the City was liable to those bondholders for the sums collected under it. The decree in that case is pleaded by the relator as res adjudioata in this. It is not necessary that I should pass upon that plea, as I am considering the defence as an original question.
In 1876 the act was passed, upon which the City relies to justify it in refusing or neglecting to-levy the tax; required-by the act of 1852. *28 Sess. Acts, p. 54. It prohibits the assessment or collection of any tax "for the payment of any bonds, or interest of any bonds, except those styled Premium bonds of tfie City, and repeals all previous laws which required or authorized the council to levy any tax for the payment of any other bonds. It deprived the Consolidated bondholders by one stroke of all process for the enforcement of their alleged contract with the city, and annihilated the security which the terms of that contract assured-to them. No tax has since been levied to pay the interest on their bonds, or to redeem any portion of them. If the General Assembly had constitutional authority to make that enactment, the relator is remediless. If otherwise, the Act of 1852 is binding upon the city.
What was the effect of the act of 1852 quoad the Consolidated bondholders and the State? Was there a contract made thereby between them, and if yea, can any subsequent legislation invalidate it? There is no distinction between a contract of a State and a contract of an individual, and a contract which a corporation makes under authority of the State is in the same category. The engagement which the City of New Orleans made, was to pay the Consolidated Bonds which were to be issued in lieu of the previous obligations of the old City, and the three Municipalities, and of Lafayette; and she stipulated as security for the performance of this engagement that a certain and specified sum should be raised by taxation each year, to be applied to the payment of the coupons, and the partial extinguishment of the principal, and as a further guaranty, the legislature in advance pronounced the nullity of all ordinances, resolutions, or other acts which the Council might pass until the ordinance imposing the Consolidation loan tax should have been adopted. This engagement was accepted by those who held the old obligations, and an exchange was effected. Here then was a contract made by a public corporation, under express authority of the legislature,' with its creditors, who assented to it by perfecting the arrangement the legislature had in contemplation. A learned author lays down the rule controlling the rights of these, contracting parties, and the obligations resting upon them thus ;■ — “ when under the exercise of powers delegated, the rights of third persons have accrued, and they have assumed the form of a contract with the municipal corporation, the legislature cannot change the powers of the corporation so as to impair the rights of its creditors. The Constitution of the United States prohibits any law impairing the obligation of contracts, and while the legislature may alter or modify the powers of the subdivisions of the State, such alteration cannot be allowed to affect the creditors of the subdivisions. They are entitled to claim that the corporation shall exercise such powers as it had at the time this contract was made.” Burroughs’ Taxation, 427. And yet more, the rights of these creditors cannot be successfully im *29 pugned by the judiciary any more than by the legislature, for the Supreme Court of the United States holds that when the Courts of a State have decided that Bonds issued by a corporation are valid, if the Courts of that State subsequently reverse that decision, and declare that the Bonds are void, because the legislature had not the power to authorize their issue, then the rights of the holders of bonds issued during the time when the courts of the State held them valid are not affected by the subsequent adverse ruling that they were invalid. Gelpcke v. City of Dubuque, 1 Wall. 175. Havemeyer v. Iowa Co. 3 Wall. 294. Lamson’s case, 9 Wall. 177.
In Van Hoffman v. City of Quincy, 4 Wall. 535, the Court say; — “it is clear that where a State has authorized a municipal corporation to contract, and to exercise the power of local taxation to the extent necessary to meet its engagements, the power of taxation thus given cannot be withdrawn until the contract is satisfied. The State and the corporation in such cases are equally bound. The power becomes a trust, which the donor cannot annul and which the donee is bound to execute, and neither the State nor the corporation can any more impair the obligation of the contract than any other.”
In Smith v. Appleton, 19 Wis. 495, that court, construing an act very similar to our act of 1852, under which new bonds had been issued to take the place of, and to be received by creditors, in the stead'of old bonds, observed that the stringent provisions of the act to secure the payment of the interest “ were obviously introduced to induce creditors to surrender their old bonds, and accept the new. These provisions, when accepted by the creditors and the city, and the new bonds were issued, constituted a most material element of the new contract. They entered into and became a part of it, and as such, are not the subject of legislative repeal or amendment, so as to impair the right or diminish the security of the creditors without their assent.”
And the same principle applies to this case. In my opinion, the city entered into a contract with the holders of the bonds, the surrender of which she was inviting, which became' complete when they exchanged them for Consolidated bonds. This contract is contained in the 37th. sec of the act of 1852. The contemporaneous construction of the Courts was, that the provisions of that section relative to the taxation upon' real estate was not a violation of the constitutional requirement of uniform and equal taxation, and therefore the legislature could not afterwards withdraw the power of taxation thus conferred for the benefit of those bondholders until the contract was satisfied, nor can the judiciaryignore its own previous and contemporaneous exposition and determination of the rights which parties have acquired under the contract to their detriment. The contract cannot be affected by any subsequent decision alter *30 ing the construction of the law. Gelpcke’s case, 1 Wall. 206. “If the contract, when made, was valid by the constitution and laws of the State as then expounded by the highest authorities whose duty was to administer them, no subsequent action of the legislature or the judiciary can impair its obligation.” Havemeyer v. Iowa Co., 3 Wall. 294. Whatever views I may entertain of the soundness or unsoundness of the construction placed by this court upon the articles of the Constitutions of 1845 and 1852, relative to equal and uniform taxation,- it is sufficient to say here that that question cannot be re-opened to the prejudice of the bondholders. Their rights are protected by the adjudications of this Court, which through a long series of decisions (with a single interruption), declared that municipal taxation was not in the contemplation of the Constitution, when it prescribed the rule of equality and uniformity, and therefore the 37th. section of the Act of 1852 is a valid enactment. The language of the U. S. Supreme court in Yan Hoffman’s ease may be literally applied to this, changing only the date of the act under consideration ; — “ The laws, requiring taxes to the requisite amount to be collected, in force when the bonds were issued; are still in force for all the purposes of this case. The act of 1863 (in our case, the act of 1876) so far as it affects these bonds, is a nullity. It is the duty of the city to impose and collect the taxes, in all respects, as if that act had not been passed. A different rule would leave nothing of the contract, but an abstract right of no practical value, and render the protection of the constitution a shadow and a delusion.” 4 Wall. 555.
The inequality of the taxation upon the assessment of 1851 has been very vividly pourtrayed by the counsel of the city. At that time a large portion, of what is now the most beautiful part of the city was unimproved. Streets, that then were considered the most desirable location» for the large commercial houses, have been surrendered to baser uses. On opposite sides of the same street the operation of the tax was unequal. This inequality has been demonstrated bya tabular statement of one of the counsel for the intervenors, .which shews that in the fourth-district the tax is less than one half that in the third.
If however it was the settled jurisprudence of this State, when the-Consolidated bonds were issued and received in exchange for old obligations, that the article of the Constitution requiring uniform and equal taxation, had reference to State taxation alone, the rights of these bondholders cannot be affected by a change of opinion of the judiciary upon-, that question. Nor can the legislature disregard, ignore, or impair the' contract which was made between the city and the bondholders. The rights of the bondholders were secured and set forth in the contract. The power of the legislature to make the provisions, which constituted, their security, was judicially declared to be within the authority of the-. *31 Constitution, and it is too late now to attempt to deprive the bondholders of the guaranty which every department of the Government gave them, that they held a just debt, amply secured, and which should be paid in the manner stipulated by their debtor.
Writ of error granted to the Supreme Court of the United States.