Mr. Justice MILLER
 

 delivered the opinion of the court.
 

 The record distinctly raises the question, how far the jurisdiction of the District Courts of the United States in admiralty causes, arising on the navigable' inland waters of this country, is exclusive, and to what extent the State courts can exercise a concurrent jurisdiction ?
 

 Nearly all the States — perhaps all whose territories are penetrated or hounded by rivers capable of floating a steamboat — have statutes authorizing their courts, by proceedings.
 
 ifi rem,
 
 to enforce contracts or redress torts, which, if they had the same relation to the sea that they have to the waters of those rivers, would be conceded to be the subjects of admiralty jurisdiction. These statutes have been acted upon for many years, and are the sources of powers exercised largely by the State courts at the present time. The question of their conflict with the constitutional legislation of Congress, on the same subject, is now for the first time presented to this court.
 

 "We are sensible of the extent of the interests to be affected by our decision, and the importance of the principles upon ■which that decision must rest, and have held the ease under advisement for some time, in order that every consideration which could properly influence the result might be deliberately weighed.
 

 
 *562
 
 There can, however, be no doubt about the judgment which we must render, unless we are prepared to overrule the entire series of decisions of this court upon the subject ■of admiralty jurisdiction on Western waters, commencing with the case of
 
 The Genesee Chief,
 
 in 1851, and terminating with that of
 
 The Moses Taylor,
 
 decided at the present term;
 
 *
 
 for these decisions supply every element necessary to a sound judgment in the ease before us.
 

 The history of the adjudications of this court on this subject, which it becomes necessary here to review, is a very interesting one, and shows with what slowness and hesitation the court arrived at the conviction of the full powers which the Constitution and acts of Congress have vested in the Federal judiciary. Yet as each position has been reached, it has been followed by a ready acquiescence on the part of the profession and of the public interested in the navigation of the interior waters of the country, which is strong evidence that the decisions rested on sound principles, and that the jurisdiction exercised was both beneficial and acceptable to the classes affected by it.
 

 From the organization of the government until the era of steamboat navigation, it is not strange that no question of this kind came before this court. The commerce carried on upon the inland waters prior to that time was so small, that cases were not likely to arise requiring the aid of admiralty courts. But with the vast increase of inland navigation consequent upon the use of steamboats, and the development of wealth on the borders of the rivers, which thus became the great water highways of an immense commerce, the necessity for au admiralty court, and the value of admiralty principles in settling controversies growing out of this system of transportation, began to be felt.
 

 Accordingly we find in the case of
 
 The Steamboat Thomas Jefferson,
 
 reported in 10 Wheaton, 428, that an attempt was made to invoke the jurisdiction in the case of a steamboat making a voyage from Shippingport, in Kentucky, to a point
 
 *563
 
 some distance up the Missouri River, and back again. This court seems not to have been impressed with the importance of the principle it was called upon to decide, as, indeed, no one could then anticipate the immense interests to arise in future, which hy the rulings in that case were turned away from the forum of the Federal courts. Apparently ivithout much consideration — certainly without anything like the cogent argument and ample illustration which the subject has since received here — the court declared that no act of Congress had conferred admiralty jurisdiction in cases arising above the ebb and flow of the tide.
 

 In the case of
 
 The Steamboat Orleans,
 
 in 11 Peters, 175, the court again ruled that the District Court had no jurisdiction in admiralty, because the vessel, which was the subject of the libel, was engaged in interior navigation and trade, and not on tide-waters. The opinion on this subject, as in the case of
 
 The Thomas Jefferson,
 
 consisted of a mere announcement of the rule, without any argument or reference to authority to support it.
 

 The ease of
 
 Waring
 
 v.
 
 Clark,
 
 8 Howard, 441, grew out of a collision within the ebb and flow of the tide on the Mississippi River, but also
 
 infra corpus comitatus.
 
 The jurisdiction was maintained on the one side and denied on the other with much confidence. The court gave it a very extended consideration, and three of the judges dissented from the opinion of the court, which held that there was jurisdiction. The question of jurisdiction above tide-water was not raised, but the absence of such jurisdiction seems to be implied by the arguments of the court as well as of the dissenting judges.
 

 The next case in order of time,
 
 The Genesee Chief
 
 12 Howard, 457, is by far the most important of the series, for it overrules all the previous decisions limiting the admiralty jurisdiction to tide-water, and asserts the broad doctrine that the principles of that jurisdiction, as conferred on the Federal courts by the Constitution, extend wherever ships float and navigation successfully aids commerce, whether internal or external.
 

 
 *564
 
 That ease arose under an act of Congress, approved February 26th, 1845,
 
 *
 
 which provides that “ the District Courts of the United States shall have, possess, and exercise the same jurisdiction in matters of contract and tort arising in, upon, or concerning steamboats, or other vessels of twenty tons burden and upwards, enrolled and licensed for the coasting trade, and at the time employed in navigation between ports and places, in different states and territories, upon the lakes and navigable waters connecting said lakes, as is now possessed and exercised by the said courts in eases of like steamboats and other vessels employed in navigation and commerce upon the high seas and tide-watei’s within the admiralty and maritime jurisdiction of the United States.” The Genesee Chief was libelled under this act for damages arising from a collision on Lake Ontario. A decree having been rendered against the vessel, the claimants appealed to this court.
 

 It was urged here that the act under which the proceeding was had was unconstitutional.
 

 1st. Because the act was not a regulation of commerce, and -was not therefore within the commercial clause of the Constitution.
 

 2d. Because the constitutional grant of admiralty powers did not extend to cases originating above tide-water, and Congress could not extend it by legislation.
 

 The court concurred in the first of these propositions, that the act could not be supported as a regulation of commerce. The Chief Justice, who delivered the opinion, then entered into a masterly analysis of the argument by which it was maintained that the admiralty power conferred by the Federal Constitution did not extend beyond tide-water in our rivers and lakes.
 

 This argument assumed that in determining the limits of those powers, we were bound by the rule which governed the Admiralty Court of Great Britain on the same subject at the time our Constitution was adopted. And it was said
 
 *565
 
 that the limit of the court’s power in that country was the ebb and flow of the tide.
 

 This was conceded to be true as a matter of fact, but the Chief Justice demonstrated that the reason of this rule was that the limit of the tide in all the waters of England was at the same time the limit of practicable navigation, and that as there could be no use for an admiralty jurisdiction -where there could be no navigation, this
 
 test
 
 of the navigability of those waters became substituted .as the rule, instead of the navigability itself. Such a rule he showed could have no pertinency to the rivers and lakes of this country, for here no such test existed. Many of our rivers could be navigated as successfully and as profitably for a thousand miles above tide-water as they could below; and he showed the absurdity of adopting as the test of admiralty jurisdiction in this country an artificial rule, which was founded on a reason in England that did not exist here. The true rule in both countries was the navigable capacity of the stream; and as this was ascertained in England by a test which was wholly inapplicable here, we could not be governed by it. The cases of
 
 The Thomas Jefferson
 
 and
 
 The Steamboat Orleans,
 
 already referred to, were then examined and overruled.
 

 This opinion received the assent of all the members of the court except one.
 

 Although the case arose under the act of 1845, already cited, which in its terms is expressly limited to matters arising upon the lakes and the navigable waters connecting said lakes, and which the Chief Justice said was a limitation of the powers conferred previously on the Federal courts, it established principles under which the District Courts of the United States began to exercise admiralty jurisdiction of matters arising upon all the public navigable rivers of the interior of the country.
 

 This court also, at the same term in which the case of
 
 The Genesee Chief
 
 was decided, held in
 
 Fretz
 
 v.
 
 Bull,
 
 in which the point was raised in argument, that the Federal courts had jurisdiction according to the principles of that case in the matter of a collision on the Mississippi Diver above tide-water.
 

 
 *566
 
 As soon as these decisions became generally known admiralty cases increased rapidly in the District Courts’of the United States, both on the lakes and rivers of the West. Many members of the legal profession engaged in these cases, and some of the courts have from this circumstance assumed, without examination, that the jurisdiction in admiralty cases arising on the rivers of the interior of the country is founded on the act of 1845; and such is perhaps the more general impression in the "West. The very learned court whose judgment we are reviewing has fallen into this mistake in the opinion which it delivered in the case before us, and it is repeated here by counsel for the defendant in error. ’
 

 Dut the slightest examination of the language of that act will show that this cannot be so, as it is confined, as we have already said, to cases arising “ on the lakes and navigable waters connecting said lakes.” The jurisdiction upon those waters is governed by that statute, but its force extends no further.
 

 The jurisdiction thus conferred is in many respects peculiar, and its exercise is in some important particulars different under that act from the admiralty jurisdiction conferred by the act of September 24th, 1789.
 

 1. It is limited to vessels of twenty tons, burden and upwards, enrolled and licensed for the coasting trade.
 

 2. To vessels employed in commerce and navigation between ports and places in different States.
 

 3. It grants a jury trial if either party shall demand it.
 

 4. ,The jurisdiction is not exclusive, but is expressly made concurrent, with such remedies as may be given by State laws.
 

 But the true reason why the admiralty powers of the Federal courts began now to be exercised for the first time in the inland waters was this: the decision in the case of
 
 The Genesee Chief,
 
 having removed the imaginary line of tide-water which had been supposed to circumscribe the jurisdiction of the admiralty courts, there existed no longer any reason why the general admiralty powers conferred on
 
 *567
 
 all tlie District Courts by the ninth section of the Judiciary Act,
 
 *
 
 should not be exercised wherever there was navigation which could give rise to admiralty and maritime causes. The Congress which framed that act — the first assembled under the Constitution — seemed to recognize this more extended view of the jurisdiction in admiralty, by placing under its control cases of seizure of vessels under the laws of impost, navigation, and trade of the United States, when those seizures were made in waters navigable from the sea by vessels of ten tons burden or upwards.
 

 The case of
 
 The Magnolia,
 
 20 Howard, 296, is another important case in the line of decisions which wé have been considering. It was a case of collision occurring on the Alabama Diver, far above the ebb and flow of the tide, on a stream whose course was wholly within the limits of the State which bears its name. This was thought to present an occasion when the doctrines announced in the case of
 
 The Genesee Chief
 
 might properly be reconsidered, and modified, if not overruled. Accordingly we find that the argument in favor of the main proposition decided in that case was restated with much force in the opinion of the court, and that a very elaborate opinion was delivered on behalf of three dissenting judges. The principles established by the case of
 
 The Genesee Chief
 
 were thus reaffirmed, after a careful and full reconsideration. It was also further decided (which is pertinent to the case before us), that the jurisdiction in admiralty on the great Western rivers did
 
 not
 
 depend upon the. act of February 3d, 1845, but that it was founded on the act of September 24th, 1789. That decision was made ten years ago, and the jurisdiction, thus firmly established, has been largely administered by all the District Courts of theDnited States ever since, without question.
 

 At the same time, the State courts have been in the habit of adjudicating causes, which, in the nature of their subject-matter, are identical in every sense with causes which are acknowledged to be of admiralty and maritime cognizance;
 
 *568
 
 and they have in these causes administered remedies which differ in no essential respect from the remedies which have heretofore been considered as peculiar to admiralty courts. This authority has been exercised under State statutes, and not under any claim of a general common-law power in these courts to such a jurisdiction.
 

 It is a little singular that, at this term of the court, we should, for the first time, have the question of the right of the State courts to exercise this jurisdiction, raised by two writs of error to State courts, remote from each other, the one relating to a contract to be performed on the Pacific Ocean, and the other to.a collision on the Mississippi River. The first of these cases,
 
 The Moses Taylor,
 
 had been decided before the present case was submitted to our consideration.
 

 The main point ruled in that case is, that the jurisdiction conferred by the act of 1789, on the District Courts, in civil •causes of admiralty and maritime jurisdiction, is exclusive by its express terms, and that this exclusion extends to the State courts. The language of the ninth section of the act admits of no other interpretation. It says, after describing the criminal jurisdiction conferred on the District Courts, that they “ shall also have
 
 exclusive
 
 original cognizance of all civil causes of admiralty and maritime jurisdiction, including all seizures under laws of impost, navigation, or trade of the United States, when the seizures are made on waters which are navigable from the sea by vessels of ten or more tons burden.” If the Congress of the United States has the right, in providing for the exercise of the admiralty powers, to which the Constitution declares the authority of the Federal judiciary shall extend, to make that jurisdiction exclusive, then, undoubtedly, it has done so by this act. This branch of the subject has been so fully discussed in the opinion of the court, in the case just referred to, that it is unnecessary to consider it further in this place.
 

 It must be taken, therefore, as the settled law of this court, that wherever the District Courts of the United States have original cognizance of admiralty causes,'by virtue of ■the act of 1789, that cognizance is exclusive, and no other
 
 *569
 
 court, state or national, can exercise it, with, the exception always of such concurrent remedy as is given by the common law.
 

 This examination of the case, already decided by this court, establishes clearly the following propositions:
 

 1. The admiralty jurisdiction, to which the power of the Federal judiciary is by the Constitution declared to extend, is not limited to tide-water, but covers the entire navigable waters of the United States.
 

 2. The original j urisdiction in admiralty exercised by the District Courts, by virtue of the act of 1789, is exclusive, not only of other Federal courts, but of the State courts also.
 

 3. The jurisdiction of admiralty causes arising on the interior waters of the United States, other than the lakes and their connecting waters, is conferred by the act of September 24th, 1789.
 

 4. The admiralty jurisdiction exercised by the same courts, on the lakes and the waters connecting those lakes, is governed by the act of February 3d, 1845..
 

 If the facts of the case before us in this record constitute a cause of admiralty cognizance, then the remedy, by a direct ' proceeding against the vessel, belonged to the Federal courts alone, and was excluded from the State tribunals.
 

 It was a case of collision between two steamboats. The case of
 
 The Magnolia
 

 *
 

 to which we have before referred, was a case of this character; and many others have been decided in this court since that time. That they were admiralty causes has never been doubted.
 

 "We thus see that every principle which is necessary to a decision of this case has been already established by this court in previous cases. They lead unavoidably to the conclusion, that the State courts of Iowa acted without jurisdiction; that the law of that State attempting to confer this jurisdiction is void, because it is in conflict with the act of Congress of September 24th, 1789, and that this act is well authorized by the Constitution of the United States. Unless
 
 *570
 
 we are prepared to retract the principles established by the entire series of decisions of this court on that subject, from and including the case of
 
 The Genesee Chief,
 
 down to that of
 
 The Moses Taylor,
 
 decided at this term, we cannot escape this conclusion. The succeeding cases are in reality but the necessary complement and result of the principles decided in the case of
 
 The Genesee Chief.
 
 The propositions laid down there, and which were indispensable to sustain the judgment in that case, bring us logically to the judgment which we must render in this case. With the doctrines of that case on the subject of the extent of the admiralty jurisdiction we are satisfied, and should be disposed to atfirm them now if they were open to controvei’sy.
 

 It may be well here to advert to one or two considerations to which our attention has been called, but which did not admit of notice in the course of observation which we have been pursuing without breaking the sequence of the argument.
 

 1. It is said there is nothing in the record to show that the Iline was of ten tons burden or upwards, and that, therefore, the case is not brought within the jurisdiction of the Federal courts. The observation is made, in the opinion of the Supreme Court of Iowa, in reference to the provision of the act of 1845, which that court supposed to confer jurisdiction on the Federal courts in the present case, if it had such jurisdiction at all. We have already shown that the jurisdiction is founded on the act of 1789. That act also speaks of vessels of ten tons burden and upwards, but not in the same connection that the act of 1845 does. In the latter act it is made essential to the jurisdiction that the vessel which is the subject of the contract, or the tort, should be enrolled and licensed for the coasting trade, and should be of twenty tons burden, or upwards. In the act of 1789, it is declared that the District Courts shall have jurisdiction in admiralty of seizures for violations of certain laws, where such seizures are made on rivers navigable by vessels of ten tons burden or upwards from the sea. In the latter case, the phrase is used as describing the carrying capacity of the
 
 *571
 
 river where the seizure is made. In the former case, it relates to the capacity of the vessel itself.
 

 2. It is said that the statute of Iowa may be fairly construed as coming within the clause of the ninth section of the act of 1789, which “saves to suitors, in all cases, the right of a common-law remedy where the common law is competent to give it.”
 

 Hut the remedy pursued in the Iowa courts, in the case before us, is in no sense a common-law remedy. It is a remedy partaking of all the essential features of an admiralty proceeding
 
 in rem.
 
 The statute provides that the vessel may be sued and made defendant without any proceeding against the owners, or even mentioning their names. That a writ may be issued and the vessel seized, on filing a petition similar in substance to a libel. That after a notice in the nature of a monition, the vessel may be condemned and an order made for her sale, if the liability is established for which she was sued. Such is the general character of the steamboat laws of the Western States.
 

 While the proceeding differs thus from a common-law remedy, it is also essentially different from what are in the West called suits by attachment, and in some of the older States foreign attachments. In these cases there is a suit against a personal defendant by name, and because of inability to serve process on him on account of non-residence, or for some other reason mentioned in the various statutes allowing attachments to issue, the suit is commenced by a writ directing the proper officer to attach sufficient property of the defendant to answer any judgment which may be rendered against him. This proceeding may be had against an owner or part owner of a vessel, and his interest thus subjected to sale in a common-law court of the State.
 

 Such actions may, also, be maintained
 
 in personam
 
 against a defendant in the common-law courts, as the common law gives; all in consistence with the grant of admiralty powers in the ninth section of the Judiciary Act.
 

 But it could not have been the intention of Congress, by the exception in that section, to give the suitor all such
 
 *572
 
 remedies as might afterwards he enacted by State statutes, for this would have enabled the States to make the jurisdiction of their courts concurrent in all cases, by simply providing a statutory remedy for all cases. Thus the exclusive jurisdiction of the Federal courts would be defeated. In the act of 1845, where Congress does mean this, the language expresses it clearly; for after saving to the parties, in cases arising under that act, a right of trial by jury, and the right to a concurrent remedy at common law, where it is competent to give it, there is added, “any concurrent remedy which may be given by the State laws where such steamer or other vessel is employed.”
 

 The judgment is REVERSED, and the case is remanded to the Supreme Court of Iowa, with directions that it be
 

 Dismissed eoe want oe juhisdiction.
 

 *
 

 Supra, p. 411.
 

 *
 

 5 Statutes at Large, 726.
 

 *
 

 1 Statutes at Large, 77.
 

 *
 

 20 Howard, 296.