# The Katie.

## Lawton v. Comer et al.

*(District Court, S. D. Georgia, E. D.    November 12, 1889.)*

1. **Shipping—Limited Liability Act—Constitutional Law—Internal Commerce.**
   The act of June 19, 1886, extending the benefits of limited liability legislation to vessels engaged in inland navigation, having been assailed for alleged unconstitutionality, *held*, that the act is valid, in view of the power of congress to regulate commerce, because the law amended, excepted from its operation inland navigation only, and not internal commerce, as insisted.

2. **Same.**
   The amendment extended the operation of the law, not to internal commerce, but to inland navigation. So much for the direct purpose of the act.

3. **Same.**
   If internal commerce is affected, it is incidentally merely. The purpose of the legislature being legitimate, and warranted by the constitution, it is wholly immaterial to the consideration of the validity of its action that somewhere it has a casual or contingent effect upon the domain of state legislation.

4. **Same.**
   Even though the subjects of this extended limitation of liability, or the territory in which it is effective, are partially within the region of state control, yet, where the subjects are separable, and are partly under the national control, the act will be sustained by the courts wherever the power of congress extends, and as to all those objects to which it attaches; and this rule is easily applicable in this case.

5. **Same—Application to Savannah River.**
   As to the Savannah river, it is a public navigable stream. The voyages of the Katie and her cargo are interstate in character, and the jurisdiction of congress is undoubted.

6. **Same—Congressional Powers—Admiralty.**
   The act is warranted also by the admiralty clause of the constitution, and the power of congress to modify by statute the application of admiralty doctrines.

7. **Same.**
   The entire purpose of the limited liability enactments was to encourage investments in shipping, and they may be extended wherever the admiralty courts of the United States have jurisdiction.

*(Syllabus by the Court.)*

In Admiralty.

*Chisolm & Erwin*, for libelant.
*Denmark, Adams & Adams*, for respondents.

SPEER, J. This is a libel brought under the provisions of section 4 of the act of congress of June 19, 1886, (24 St. at Large, 80.) Its purpose is to limit the liability of the owner of the steamer Katie for losses to her cargo occasioned by fire. The libelant (the owner) alleges that he is not liable at all for the damage which occurred to the cargo, but, if liable, to limit the liability, he prays to be accorded the benefit of the act referred to. The allegations of the libel are that the Katie was on her trip when the fire occurred. At that time, and for 20 years prior thereto, she had been engaged in transporting freight and passengers from and to the ports of Savannah and Augusta, and intermediate landings on the Savannah river in the states of South Carolina and Georgia. She belonged to a line of carriers issuing through bills of lading to and from localities in Georgia, and to and from ports and places in the other states of the Union, and to and from foreign ports. The libel contains the usual averments that the damage was done without the privity or knowledge of the owner. It is admitted in the pleadings that a large portion of the cargo was laden at different points on the Georgia side of the river, and was consigned to merchants in Savannah, and that other portions, consigned in like manner, were received from the South Carolina landings.

The various owners of the cargo, as respondents, have interposed a demurrer and motion to dismiss the libel, upon the ground that the fourth section of the act of congress of June 19, 1886, is, as they insist, unconstitutional and void; and since the owners of vessels used in rivers or inland navigation were expressly excluded from the right to limit their liability under previous acts of congress (sections 4283–4289, Rev. St.) it follows, they contend, that no relief can be granted under the allegations and prayers of the libel. The gist of the contention of proctors for respondents may be stated as follows: **(1)** They insist that section 4 of act of June 19, 1886, extending the right to limit liability to the owners of "all vessels used on lakes or rivers, or in inland navigation, including canal-boats, barges, and lighters," was intended to affect, and *ex vi termini* does affect, vessels used in the purely internal commerce of a state; that this purpose of the act is expressed in unequivocal words. (2) Even though it be conceded, they urge, that congress might have provided a measure of relief for owners of a vessel whose interstate traffic relations were corresponding to those of the Katie, without encroaching upon the domain of internal commerce, the court, they insist, may not restrict the application of this act so as to give it partial effect simply because the facts here are appropriate to national control, the statute itself in plain and unambiguous terms, exceeding they contend the limitations of the commerce clause of the constitution. This clause, they maintain, so far from authorizing, actually prohibits legislation by congress, which will affect the internal commerce between citizens of the same state, and since the terms of the act in question comprehend alike constitutional and unconstitutional topics, the entire section of the amended statute must, they argue, be held

inoperate and void; citing *U. S.* v. *Reese,* 92 U. S. 220; *Trade-Mark Cases,* 100 U. S. 82; *Virginia Coupon Cases,* 114 U. S. 304, 5 Sup. Ct. Rep. 903; *Leloup* v. *Port of Mobile,* 127 U. S. 647, 8 Sup. Ct. Rep. 1380 ; *Spraigue* v. *Thompson,* 118 U. S. 90, 6 Sup. Ct. Rep. 988; *Allen* v. *Louisiana,* 103 U. S. 80; *State Tonnage Tax Cases,* 12 Wall. 219. (3) While respondents concede the power of congress to provide, by inspection, license regulations, etc., for the safety of vessels engaged in internal traffic, they insist there is a distinction between inspection and other laws intended to control the character of machinery, equipment, and 'the like in vessels plying upon the navigable waters of the United States, and laws intended to enlarge or to limit the contract rights and liabilities of persons concerned with the same vessels; that the legislation, for the one purpose, may be warranted by the commerce clause of the constitution, but for the purpose of affecting the rights of persons contracting with vessels engaged exclusively in the internal traffic of a state the enactments of congress are nugatory; citing *The Daniel Ball,* 10 Wall. 557; *Ex parte Boyer,* 109 U. S. 631, 3 Sup. Ct. Rep. 434; *Hatch* v. *Iron Bridge Co.,* 6 Fed. Rep. 329; *Yale Lock Manuf'g Co.* v. *James,* 20 Fed. Rep. 903; *Sands* v. *Improvement Co.,* 123 U. S. 295, 8 Sup. Ct. Rep. 113. (4) They further insist that the legislation embodied in the act of March 3, 1851, and in sections 4283-4289 of the Revised Statutes, was construed by the supreme court of the United States, and by other federal courts, to be authorized by the commerce clause of the constitution; citing *Moore* v. *Transportation Co.,* 24 How. 37; *Lord* v. *Steam-Ship Co.,* 102 U. S. 541; *The Genesee Chief,* 12 How. 443; *The Bright Star,* 1 Woolw. 274; *The Mamie,* 5 Fed. Rep. 819; *The War Eagle,* 6 Biss. 366. They argue that the enactments are otherwise without constitutional warrant or validity. (5) They assert that the provision of the constitution, "the judicial power shall extend to all cases of admiralty and maritime jurisdiction," has relation merely to the law of the forum, and gives no authority to congress to regulate the property rights and liabilities of parties litigant. Moreover, even though it be conceded they say that the admiralty clause confers upon congress the power to legislate as to all topics which are properly within the admiralty jurisdiction, nevertheless the act of June 19, 1886, is broader even than that extensive domain, for it applies to all inland waters, while the admiralty jurisdiction is limited to those waters which, by themselves, or their connections with others, form a continuous channel for commerce among the states or with foreign countries; citing *The Daniel Ball,* 10 Wall. 557; *The Genesee Chief,* 12 How. 443; *Allen* v. *Newberry,* 21 How. 244; *The Hine,* 4 Wall. 569; *The Belfast,* 7 Wall. 624; *The St. Lawrence,* 1 Black, 527.

Proctors for respondents instance rivers and inland waters in the states which are not included in the navigable waters of the United States; and they cite *Veazie* v. *Moor,* 14 How. 568; *The Montello,* 11 Wall. 411; *Sands* v. *Improvement Co.,* 123 U. S. 295, 8 Sup. Ct. Rep. 113. By all of this reasoning they reach with great apparent confidence the conclusion that the act of June 19, 1886, has no foundation upon the admiralty clause, and none upon the commerce clause, of the constitu-

tion, and must therefore be wholly disregarded, and as a consequence, that the libel must be dismissed.

It is not difficult it would seem, for the observing mind, trained in the philosophy and history of our law, to appreciate the interesting considerations of legal thought suggested by the pending inquiry and the gigantic magnitude of the values which its ultimate adjudication may affect. Should the propositions of the respondents be deemed finally controlling, this would afford the twenty-first instance when an act of congress was decisively adjudged unconstitutional. When it is considered that this record of legislative conscientiousness and judicial conservatism embraces a period of ninety-nine years, the inchoate and formative period of a vast and novel experiment in the science of government, the exciting exigencies of foreign wars, the corroding inflammation of civil strife, the expansion of three millions of primitive people, employed mainly in the simple and unproductive occupations of frontiersmen, to sixty millions whose ventures in the production of national wealth are as diverse in character as they are intrepid in enterprise and affluent in results; when also, the mighty volume of decided cases, involving the application or interpretation of the constitution, is considered,—it must be granted that the national legislation is with substantial uniformity stable and valid, and that the occasions when it may be held by the courts invalid are rarely afforded. It is equally obvious that the courts will decline to adjudge a statute to be in conflict with the constitution, unless the reasons therefor are of that convincing and imperative character which at once clear the mind of doubt and constrain the inevitable decision.

The attempted impeachment of the fourth section of the act of June 19, 1886, extending the privilege of limited responsibility to "all vessels used on lakes or rivers, or in inland navigation, including canal-boats, barges, and lighters," is evolved mainly from this premise of respondents' proctors:

"It seems to us clear that section 4 of the act (save in the use of the words 'sea-going vessels') directly collides with the constitution, and that its expressed purpose was to do the very thing which congress is prevented from doing. The law, as it stood, excepted from the operation the owners of vessels engaged in internal commerce. The design of the act of 1886 was so to change the excepting clause as to apply the law to such owners and commerce. Take the law as it was in connection with this fourth section, and it will then appear that the purpose was to do an unconstitutional thing; that is to say, the very legislation proposed was unconstitutional if our contention be correct as to the power of congress."

In this connection it may be well to state that elsewhere in the copious and valuable brief from which the quotation is taken an important axiom of constitutional interpretation is frankly set forth, viz., "that a court ought not to declare a law unconstitutional unless the fatal infirmity is made clearly to appear,—to appear, beyond any reasonable doubt." With this cardinal rule in mind, let us attempt to ascertain if there is not at least a reasonable doubt as to the existence of error or misapprehension in the propositions of the proctor, above set forth. Is it true that

congress has "expressed the purpose" by this amendment to take control of the internal commerce of the states? Did the law, before the amendment, except from its operation the owners of vessels engaged in internal commerce? Does the amendment assailed · apply the law to such owners and commerce? Is it true that the "purpose of congress was to do an unconstitutional thing?" It does not appear that the law of limited liability before the 19th of June, 1886, excepted from its operation the owners of vessels engaged in internal commerce. The language of the exception was applicable to the owners of craft of certain description plying upon certain waters. It is wholly silent as to the character or kind of commerce for which the vessels or the water routes were utilized. This is plainly apparent from the language of the proviso before the amendment was adopted:

"This act shall not apply to the owner or owners of any canal-boat, barge, or lighter, or to any vessels of any description whatsoever, used in rivers or inland navigation."

It should not be difficult to understand that this is widely variant from the proposition of respondents. The excepting clause, if their construction had been adopted, would probably have read:

"This act shall not apply to the owners of any vessel, etc., used in purely internal commerce."

There is, or may be, a vast distinction in the lading, or contracts of a vessel used in inland navigation, and one used for internal commerce. A vessel may be used for internal commerce and never traverse inland waters, or may ply the waters of a lake embosomed in the central te. :-tory of a state, and be wholly engaged in interstate commerce. Then it is not true that the law, before the amendment, excepted from its operation the owners of vessels engaged in internal commerce, but simply those whose vessels were used in rivers or inland navigation. Again, does the amendment to the limited responsibility law, assailed by the respondents, apply to the "owners of vessels engaged in internal commerce?" In the opinion of the court, very clearly not. It has no syllable with reference to internal commerce. It "shall apply also to all vessels used on lakes or rivers, or in inland navigation, including canal-boats, barges, and lighters." Congress, in the amendment as in the excepting clause of the act of 1851, *supra*, dealt entirely with classes of vessels navigating inland waters and lakes, and gave no attention to cargoes or shipping contracts. It did not deal with commerce, but with shipping. As we have before seen, there is no essential identity of topic in a vessel and the character of the commerce in which it is engaged. By a parity of reasoning it follows that congress has not, by this extension of the limited responsibility privilege, expressed the purpose to take control of internal commerce, nor, so far as it has been made to appear, was it its purpose to do an unconstitutional thing. These conclusions seem to be clearly inferable from the plain and unambiguous words of the clauses which constituted the old law and the remedial statute which, as we will presently see, is but an encouragement to important classes of ship-

ping in which the wealth of the country is largely invested. But if the language of the sections quoted was equivocal, there would even then be no difficulty in tracing to its constitutional source the current of this legislation, which has revived the drooping but vital growth of the country's maritime interests. It is well to remember that it is an elementary principle of construction, not only that the scope of a legislative enactment may be modified by the purpose expressed in the title, but that the intention of the legislature is often gathered from a view of the whole, and every part, of continuous legislation on the same general topic. 1 Kent, Comm. 461, 462. Upon consideration of the several enactments on the subject of limiting responsibility of the owners of shipping, it is not possible to discover any purpose of the national legislation to encroach upon the conceded rights of the states as to internal commerce. It may be, and is, no doubt, true that much of this legislation does incidently affect rights growing out of internal commerce. That, however, is a necessary result, flowing from the variety and extent of the influence, exerted by every act of congress of general operation, howsoever undoubted its constitutionality. An illustration of this may be found in the laws relating to internal taxation. Who may say these do not affect internal commerce? and yet the power of congress is conceded. In the amplitude and diversity of the occupations and enterprises of our countrymen many results flow from congressional action which, if designed as a result of direct legislation, would be held unwarranted. It is enough to say of a law that its purpose, object, and main results are legitimate, and the law of limited responsibility has been often so adjudged. *Norwich Co.* v. *Wright*, 13 Wall. 109–128. The act of March 3, 1851, was entitled "An act to limit the liability of ship-owners, and for other purposes." Its provisions applicable to the questions at bar, embodied in sections 4283–4289, Rev. St., are as follows:

"The liability of the owner of any vessel for any embezzlement, loss, or destruction, by any person, of any property, goods, or merchandise shipped or put on board of such vessel, or for any loss, damage, or injury by collision, or for any act, matter, or thing lost, damage or forfeiture done, occasioned, or incurred without the privity or knowledge of such owner or owners, shall in no case exceed the amount or value of the interest of such owner in such vessel, and her freight then pending." Section 4283, Rev. St. "The provisions of [this title, the seven preceding sections,] relating to the limitation of the liability of the owners of vessels, shall not apply to the owners of any canal-boat, barge, or lighter, or to any vessel of any description whatsoever, used in rivers or inland navigation." Section 4289, Rev. St.

The legislation upon this subject, next succeeding the act of 1851, is found in the act of June 26, 1884, (23 St. at Large, 53.) This, it is important to observe, is entitled "An act to remove certain burdens on the American merchant marine, and encourage the American foreign carrying trade, and for other purposes." The eighteenth section of this act is as follows:

"That the individual liability of a ship-owner shall be limited to the proportion of any or all debts and liabilities that his individual share of the

vessel bears to the whole, and the aggregate liabilities of all the owners of a vessel, on account of the same, shall not exceed the value of such vessel and freight pending: provided, that this provision shall not affect the liability of any owner incurred previous to the passage of this act, nor prevent any claimant from joining all the owners in one action, nor shall the same apply to wages due to persons employed by said ship-owners."

We thus perceive that the title indicates what the body of the act makes clear, viz., that it was intended to encourage, and therefore to foster, the American merchant marine and the American foreign carrying trade. Its chief modification of the existing law was an enlargement of the privileges of exemption. It will be readily observed that it was the consistent legislative purpose to broaden the privileges of the owners of American craft upon the high seas. The enactments it seems were found advantageous also, as they were followed very soon afterwards by the act of June 19, 1886, (24 St. at Large, 79,) which is entitled "An act to abolish certain fees for official services to American vessels, and to amend the laws relating to shipping commissioners, seamen, and owners of vessels, and for other purposes." The fourth section of this act extends previous enactments relating to limitations of liability to "all sea-going vessels," and here the respondents insist the national legislature exhausted its jurisdiction.

But it was not deemed enough to accord these privileges to sea-going vessels. A vast and rapidly augmenting fleet of American shipping, embracing every type of vessel, from the clumsy sailing craft of the last century, to the latest achievements in naval architecture, whose twin screws and triple expansion engines drive them with incredible swiftness over the teeming waters of the Great Lakes, were wisely esteemed by congress to merit the aid and encouragement of the legislation which had been so effective with sea-going shipping. Nor was this all. It had been found that the vital necessity for cheap transportation for the natural and manufactured productions of the country, often denied in greater or less measure, by railway combinations, had been accomplished by a return to the slower, but cheaper methods of water carriage. Rivers, canals, and inland lakes, by themselves or their connections, in many instances afford the most important channels for the ebbing and flowing tide of interstate and foreign commerce. In the case of *The Daniel Ball*, 10 Wall. 557, where the recovery of a penalty under the act of congress for failure to obtain a license to transport merchandise and passengers upon the bays, lakes, rivers, or other navigable waters of the United States was resisted upon the ground that the steamer navigating the Grand river, in the state of Michigan, was not engaged in interstate commerce, and for this reason it was insisted congress had no control over her, the supreme court make very pertinent declarations. They decided that the Grand river was a navigable stream. They hold that rivers "are navigable in fact when they are used, or are susceptible of being used, in their ordinary condition, as highways for commerce, over which trade and travel are, or may be, conducted in the customary modes of trade and travel on water, and they constitute navigable waters of the United States, with-

in the meaning of the acts of congress, in contradistinction from the navigable waters of the states, when they form, in their ordinary condition, by themselves, or by uniting with other waters, a continuous highway, over which commerce is, or may be, carried on with other states or foreign countries, in the customary modes in which such commerce is conducted by water." 10 Wall. 563. This test was applied to Grand river, and the conclusion was reached that it was a navigable stream, and the court adds:

"And by its junction with the lake it forms a continued highway for commerce, both with other states and with foreign countries, and is thus brought under the direct control of congress."

The court continues:

"That power [the power to regulate commerce] authorizes all appropriate legislation for the protection or advancement of either interstate or foreign commerce, and, for that purpose, such legislation as will insure the convenient and safe navigation of all the navigable waters of the United States, whether that legislation consists in requiring the removal of obstructions to their use, in prescribing the form and size of the vessels employed upon them, or in subjecting the vessels to inspection and license, in order to insure their proper construction and equipment. 'The power to regulate commerce,' this court said in *Gilman* v. *Philadelphia*, 3 Wall. 724, 'comprehends the control for that purpose, and to the extent necessary, of all navigable waters of the United States which are accessible from a state other than those in which they lie. For this purpose they are the public property of the nation, and subject to all the requisite legislation of congress.' But it is contended that the steamer Daniel Ball was only engaged in the internal commerce of the state of Michigan, and was not, therefore, required to be inspected or licensed, even if it be conceded that Grand river is a navigable water of the United States; and this brings us to the consideration of the second question presented. There is undoubtedly an internal commerce which is subject to the control of the states. The power delegated to congress is limited to commerce 'among the several states,' with foreign nations, and with the Indian tribes. This limitation necessarily excludes from federal control all commerce not thus designated, and of course that commerce which is carried on entirely within the limits of a state, and does not extend to or affect other states. In this case it is admitted that the steamer was engaged in shipping, and transporting down Grand river, goods destined and marked for other states than Michigan, and in receiving, and transporting up the river, goods brought within the state from without its limits; but inasmuch as her agency in the transportation was entirely within the limits of the state, and she did not run in connection with, or in continuation of, any line of vessels or railway leading to other states, it is contended that she was engaged entirely in domestic commerce. But this conclusion does not follow. So far as she was employed in transporting goods destined for other states, or goods brought from without the limits of Michigan, and destined to places within that state, she was engaged in commerce between the states; and, however limited that commerce may have been, she was, so far as it went, subject to the legislation of congress. She was employed as an instrument of that commerce; for, whenever a commodity has begun to move as an article of trade from one state to another, commerce in that commodity between the states has commenced. The fact that several different and independent agencies are employed in transporting the commodity, some acting entirely in one state, and some acting through two or more states, does in no respect affect the character of the transaction. To the extent in which each agency acts in that transportation,

it is subject to the regulation of congress.  It is said that, if the position here
asserted be sustained, there is no such thing as the domestic trade of a state;
that congress may take the entire control of the commerce of the country,
and extend its regulations to the railroads within a state on which grain or
fruit is transported to a distant market.  We answer that the present case
relates to transportation on the navigable waters of the United States, and
we are not called upon to express an opinion upon the power of congress
over interstate commerce when carried on by land transportation.  And we
answer, further, that we are unable to draw any clear and distinct line be-
tween the authority of congress to regulate an agency employed in commerce
between the states when that agency extends through two or more states, and
when it is confined in its action entirely within the limits of a single state.
If its authority does not extend to an agency in such commerce when that
agency is confined within the limits of a state, its entire authority over inter-
state commerce may be defeated.  Several agencies combining, each taking
up the commodity transported at the boundary line at one end of a state, and
leaving it at the boundary line at the other end, the federal jurisdiction would
be entirely ousted, and the constitutional provision would become a dead let-
ter."

See, also, *The Montello*, 11 Wall. 411, 20 Wall. 430; *Ex parte Boyer*,
109 U. S. 629, 3 Sup. Ct. Rep. 434.  In the case last cited the water-
way upon which the collision occurred was actually the property of the
state of Illinois, and was wholly artificial, and was wholly within its ter-
ritorial boundaries.  The court says, through Mr. Justice BLATCHFORD:

"Within the principles laid down by this court in the cases of *The Daniel
Ball*, 10 Wall. 557, and *The Montello*, 20 Wall. 430, which extended the sal-
utary views of admiralty jurisdiction applied in *The Genesee Chief*, 12 How.
443, *The Hine* v. *Trevor*, 4 Wall. 555, and *The Eagle*, 8 Wall. 15, we have no
doubt of the jurisdiction of the district court in this case."  "Navigable water,
situated as this canal is, used for the purposes for which it is used, a high-
way for commerce between ports and places in different states, carried on by
vessels such as those in question here, is public water of the United States."

It is true that this case considers and decides a question of admiralty
jurisdiction; but the canal, although wholly artificial, and wholly within
the body of the state, is declared public water, for the reason that it is a
conduit for interstate commerce.   In concluding the opinion, Mr. Justice
BLATCHFORD observes:

"This case does not raise the question whether the admiralty jurisdiction
of the district court extends to waters wholly within the body of a state, and
from which vessels cannot so pass as to carry on commerce between places in
such state and places in another state or in a foreign country, and no opinion
is intended to be intimated as to jurisdiction in such a case."

The case was decided in January, 1884.   In December, 1870, in the
case of *The Montello*,—a proceeding to recover a penalty under a statute
operative upon the "bays, lakes, rivers, or other navigable waters of the
United States,"—Mr. Justice FIELD, for the court, declares that the
stream "can only be deemed a navigable water of the United States when
it forms by itself, or by its connection with other waters, such a high-
way."  "If, however," the learned justice continues, "the river is not of
itself a highway for commerce with other states or foreign countries, or
does not form such a highway by its connection with other waters, and

is only navigable between different places within the state, then it is not a navigable water of the United States, but only a navigable water of the state, and the acts of congress   *   *   *   for the enrollment and license of vessels have no application. Those acts only require such enrollment and license for vessels employed upon the navigable waters of the United States." It will be observed that this was the construction of a penal statute, and its application under the admiralty power. But, for the regulation of interstate commerce, as we shall presently see, congress has enacted legislation with reference to the commerce upon water routes, whether they form by connection with other waters or with railways, a highway for continuous carriage or shipment of passengers or property. The power of congress for this purpose is, we believe, generally conceded. If, therefore, the navigable waters of a state wholly within the state, and with no exterior water connection, are yet utilized under "common control, management, or arrangement," in connection with railroads, for "continuous carriage,"—in other words, for interstate commerce,—for the purposes of such commerce,—they would become public waters of the United States, and subject to congressional control under the commerce clause (paragraph 3, § 8, art. 1) of the constitution, if not under the admiralty clause. See act of February 4, 1887, entitled "An act to regulate commerce," (24 St. at Large, 379.)

But if it be true, as contended, that the terms of the act of June 19, 1886, are so broad that they affect the navigable waters of a state upon which there are vessels wholly engaged in internal commerce, must the act be held a nullity for that reason? From the fact that the indefatigable proctors for respondents have referred to the Kissimee, in Florida, and the Jordan, in Utah, to illustrate their argument, it is perhaps fairly inferable that such streams and lakes are very rare. It is probable, also, that the commerce which they convey is comparatively unimportant. Now, is it not the duty of the court to sustain the act under consideration if it appears that its application to the navigable inland waters of the United States, and to the great body of commerce, is valid and appropriate, even though it may affect, upon occasion, commerce wholly within a state? Concede that its language is susceptible of the meaning suggested by the respondents, it is nevertheless clearly warranted, and operative, as to all the important inland navigation of the country and the Great Lakes, and as to a mighty volume of commercial transactions. It has long been settled that statutes, constitutional in part only, will be upheld so far as they are not in conflict with the constitution, provided the allowed and prohibited parts are separable. *Packet Co.* v. *Keokuk,* 95 U. S. 80. A case of controlling authority upon the proposition that the statute may be valid as to one class of commerce, even though invalid as to another, is *Ratterman* v. *Telegraph Co.,* 127 U. S. 411-428, 8 Sup. Ct. Rep. 1127. There a single tax was assessed by the state of Ohio upon the receipts of the telegraph company. These were derived as well from interstate as from internal commerce. The items of the income account were of course capable of separation, but they were returned and assessed in gross, and without separation or apportionment.

A bill was presented to the judge of the circuit court of the United States, sitting in chancery, by the telegraph company, with averments that the tax was illegal and void, and in conflict with the constitution of the United States, for the alleged reason that the state was seeking by the act to impose a tax upon gross receipts principally accumulated from interstate telegraphic messages. The prayers were that the defendant, to-wit, the treasurer, may be compelled to accept that portion of the tax lawfully due the state and country, and that he may be enjoined from levying or collecting the balance of the assessment. To the bill a general demurrer was filed. The circuit court, after argument, upon an agreed submission of facts, which was in the main but a statement of the separate amounts received from business within the state, and from business between points in Ohio and in other states, held that the tax by the state, so far as apportioned to receipts derived from interstate communication, was unconstitutional and void, but, as apportioned to messages within the state, it was valid. The case reached the supreme court by a certificate of difference of opinion between the circuit and the district judge; and Mr. Justice MILLER, for the court, presenting the unanimous opinion with the characteristic vigor and clearness of his judicial deliverances, has with precision, and we think with conclusiveness, defined the rule for our guidance. After stating the question certified, and observing that the agreement of parties had avoided the point that the tax was not separable, the learned justice decisively states:

"Nor do we believe, if there were allegations, either in the bill or answer, setting up that part of the tax was from interstate commerce, and part from commerce wholly within the state, that there would have been any difficulty in securing the evidence of the amount of receipts chargeable to these separate classes of telegrams by means of the appointment of a referee or master to inquire into that fact, and make report to the court. Neither are we of opinion that there is any real question, under the decisions of this court, in regard to holding that, so far as this tax was levied upon receipts properly appurtenant to interstate commerce, it was void, and that, so far as it was only upon commerce wholly within the state, it was valid."

How apposite is this language to the facts before the court! Here the books and bills of lading of the steamer would show every fact essential to the apportionment of the cargo into classes of internal and interstate traffic and freight. But even more pertinent is the next succeeding remark of the learned justice: "This precise question was adjudged in the *Case of State Freight Tax*, 15 Wall. 232." There a statutory tax of Pennsylvania of two cents for one class, three cents for another, and five cents for another, imposed upon every ton of freight transported by any railroad or canal of that state, was resisted by the Reading Railroad Company on the ground that it was levied on interstate commerce. The returns of the railroad company to the accounting officers stated separately the amount of freight carried wholly within the state, and the amount brought into or carried out of the state. The court held "that the tax upon the former class * * * was valid under the law of Pennsylvania, by which it was imposed; but that the

latter classes, being commerce among the states, were not subject to such taxation." These cases are very satisfactory.

It is also true that apportionment and separation of subjects under control of the state, and without such control, will apply to the transportation routes, as well as to the freight transported or messages forwarded. In the case of *Telegraph Co.* v. *Massachusetts*, 125 U. S. 530, 8 Sup. Ct. Rep. 961, where a tax by that state, estimated against the company upon the length of its lines within the state, as proportioned to their length elsewhere, it was held that since lines along post routes and across navigable waters of the United States were not subject to taxation; and since, in the state, 233,455 miles of the defendant's lines were thus exempted, there remained only 49,850 miles not exempt; and upon this the company offered to pay the proportion of the tax assessed against it according to mileage by the state authorities. The remaining assessment was enjoined. "We refer to this now," continues this valuable opinion, "only for the purpose of showing how easily the question of taxation which is forbidden by the constitution may be separated from that which is permissible in this class of cases." If the subjects of taxation are so readily classified to mark the separate domain of federal and state taxing power, how entirely justifiable will be the same process when necessary to maintain the validity of national legislation! This, as we have seen, is the unquestionable duty of the court. *Vide*, also, *Tiernan* v. *Rinker*, 102 U. S. 123; *Steam-Ship Co.* v. *Pennsylvania*, 1 Int. St. Com. R. 311; *Telegraph Co.* v. *Pennsylvania*, 128 U. S. 39, 9 Sup. Ct. Rep. 6. A case very interesting and very instructive as to this important topic is *Steam-Ship Co.* v. *Pennsylvania*, 122 U. S. 326–345, 7 Sup. Ct. Rep. 1118. The opinion of the court, rendered by Mr. Justice BRADLEY, comprehends an attractive analysis of the more pertinent decisions upon this rule, with copious references to many others.

It will be observed that we have heretofore considered the argument submitted by respondents' proctors as if a portion of the cargo of the Katie was shipped to be transported wholly within the state. It is true, however, as we shall presently see, that all of it is properly to be regarded as interstate in its character. It is true, also, that the Katie was engaged, in the strictest sense, in interstate and foreign commerce, and that the Savannah river between Augusta and Savannah is, as clearly, as the Mississippi between St. Louis and New Orleans, a navigable river of the United States. We extract the following from the valuable and elaborate brief of Mr. Robert Erwin, the proctor for libelant:

"The state of Georgia is bounded on the east by a line running from the sea, or the mouth of the river Savannah, along the stream thereof, to the fork or confluence made by the rivers Keowee and Tugalo. Code Ga. § 15. It is proper to state, however, that there has been much discussion as to whether the state of Georgia extends only to the thread of the stream or to the Carolina shore. However that may be, the second article adopted by the convention of Beaufort, which settled the boundary between Georgia and South Carolina, provided that the navigable portion of the Savannah river should be henceforth equally free to the citizens of both states, and exempt from all duties, tolls, hindrance, interruption, and molestation whatsoever attempted

to be enforced by one state on the citizens of another. See Hotchkiss, St. Law Ga. 916. And as the steam-boat Katie, on every trip, touched at landings on both shores of the river,—that is, in South Carolina and in Georgia, —there can be no doubt that she was engaged in interstate commerce."

In *Cotton Exchange* v. *Railroad Co.*, 2 Int. Com. R. 375–388, we find it announced that commerce between points in the same state, but which passes through another state, is regarded and treated as interstate commerce. Mr. Commissioner Morrison, stating the conclusion of the commission, on page 386, uses the language following:

"While passing through Mississippi, after passing from Louisiana, this commerce is interstate, and subject alone to interstate regulations. It is not subject at any place between Shreveport and New Orleans to regulation by both the state and the congress. It passes by continuous carriage from Louisiana to and through the state of Mississippi. It is not transportation 'wholly within the state.' It is subject to regulation by the provision of the act to regulate commerce, and the commission has jurisdiction to reserve the rates, where the parties interested in them are before it."

This report is strongly advisory, and the statement quoted seems otherwise altogether justifiable. Then the Katie was in all respects engaged in interstate commerce. See, also, *Gloucester Ferry Co.* v. *Pennsylvania*, 114 U. S. 196, 5 Sup. Ct. Rep. 826; *The Daniel Ball, supra.*

To summarize our conclusions upon this important and interesting topic, we are of opinion that the act of June 19, 1886, is valid, in view of the power of congress to regulate commerce: (1) Because the law, amended, excepted from its operation inland navigation only, and not internal commerce, as insisted. (2) The amendment extended the operation of the law, not to internal commerce, but to inland navigation. So much for the direct purpose of the act. (3) If internal commerce is affected, it is incidentally, merely; and the purpose of the legislature being legitimate, and warranted by the constitution, it is wholly immaterial to the consideration of its validity that somewhere it has a casual or contingent effect upon the domain of state legislation. (4) Even though the subjects of this extended liability, or the territory in which it is effective, are partially within the region of state control, yet, where they are separable, and are partly under the national control, the act will be sustained by the courts wherever the power of congress extends, and as to all those objects to which it attaches; and this rule is easily applicable to the facts. (5) As to the Savannah river, it is a public navigable stream. The voyages of the Katie and her cargo are interstate in character, and the jurisdiction of congress is undoubted.

It will be seen that the question presented as to the constitutionality of the clause extending the benefit and privilege of limited responsibility to the owners of vessels engaged in navigating the inland public waters of the United States has been heretofore considered solely with relation to the commercial power of congress. But the commerce clause of the constitution is not the only title to the validity and effectiveness of the enactments. It is equally clear that the amendment is warranted by section 2, art. 3, of the constitution, which extends the judicial power of the United States to all cases of admiralty and maritime jurisdiction.

Since this demurrer was argued, the supreme court of the United States, in *Butler* v. *Steam-Ship Co.*, 130 U. S. 527–558, 9 Sup. Ct. Rep. 612, has settled with distinctness the following principles applicable to this discussion: The law of limited liability was enacted by congress as part of the maritime law of the United States, and is co-extensive in its operation with the whole territorial domain of that law. (2) While the general maritime law, with slight modifications, is accepted as law in this country, it is subject, under the constitution, to such modifications as congress may see fit to adopt. (3) The limited liability act applies to the case of a disaster happening within the technical limits of a county in a state, and to a case in which the liability itself arises from a law of the state. The case resulted from the well-known disaster to the City of Columbus near Gay Head, at the western extremity of Martha's Vineyard; and it was insisted by respondents to the libel to limit liability, filed by the steam-ship company, that the doctrine had no application to cases of personal injury and death, and none in the technical limits of a county in a state, nor to a cause of action created by state law. All of these propositions were negatived by the court. The case seems to have been argued with great care and elaboration; and the opinion, rendered by Mr. Justice BRADLEY, is most valuable. The learned justice declares that the purpose of the limited liability law is,—we may observe, not to affect internal commerce,—but for the encouragement of ship-building, and the employment of ships in commerce. He refers to the various attempts which have been made to narrow the operation of the statute. He cites the leading cases in which the beneficent object of the law has been set forth: *Norwich Co.* v. *Wright*, 13 Wall. 104; *Steam-Ship Co.* v. *Manufacturing Co.*, 109 U. S. 578, 3 Sup. Ct. Rep. 379, 617. "The law of limited liability," says the learned justice, "as we have frequently had occasion to assert, was enacted by congress as a part of the maritime law of this country, and therefore it is co-extensive in its operation with the whole territorial domain of that law." *Norwich Co.* v. *Wright*, 13 Wall 104–127; *The Lottawanna*, 21 Wall. 558–577; *The Scotland*, 105 U. S. 24, 29–31; *Steam-Ship Co.* v. *Manufacturing Co.*, 109 U. S. 578–593, 3 Sup. Ct. Rep. 379, 617. In *The Lottawanna* we said:

"It cannot be supposed that the framers of the constitution contemplated that the law should forever remain unalterable. Congress undoubtedly has authority under the commercial power, if no other, to introduce such changes as are likely to be needed." Page 577.

Again, on page 575, speaking of the maritime jurisdiction referred to in the constitution, and the system of law to be administered thereby, it was said:

"The constitution must have referred to a system of law co-extensive with, and operating uniformly in, the whole country. It certainly could not have been the intention to place the rules and limits of maritime law under the disposal and regulation of the several states, as that would have defeated the uniformity and consistency at which the constitution aimed on all subjects of a commercial character affecting the intercourse of the states with each other or with foreign states."

In *The Scotland* this language was used:

"But it is enough to say that the rule of limited responsibility is now our maritime rule. It is the rule by which, through the act of congress, we have announced that we propose to administer justice in maritime cases." Page 31.

Again, in the same case, (page 29,) we said:

"But whilst the rule adopted by congress is the same as the rule of the general maritime law, its efficacy as a rule depends upon the statute, and not upon any inherent force of the maritime law. As explained in *The Lotta-wanna*, the maritime law is only so far operative as law in any country as it is adopted by the laws 'and usages of that country; and this particular rule of the maritime law had never been adopted in this country until it was enacted by statute. Therefore, whilst it is now a part of our maritime law, it is nevertheless statute law."

And in *Steam-Ship Co.* v. *Manufacturing Co.* it was said:

"The rule of limited liability prescribed by the act of 1851 is nothing more than the old maritime rule administered in courts of admiralty in all countries except England from time immemorial; and, if this were not so, the subject-matter itself is one that belongs to the department of maritime law." 109 U. S. 593, 3 Sup. Ct. Rep. 389.

These quotations are believed to express the general, if not unanimous, views of the members of this court for nearly 20 years past, and they leave us in no doubt that while the general maritime law, with modifications, is accepted as law in this country, it is subject to such amendments as congress may see fit to adopt. One of the modifications of the maritime law as received here was a rejection of the law of limited liability. We have rectified that. Congress has restored that article to our maritime Code. We cannot doubt its power to do this.

At this point it is material to observe that the exception to the act of 1851 denying the statute operation to inland waters was added in the senate. It seems to have been suggested by an act of parliament in the reign of Geo. III. which provided that these privileges "should not extend to the owners of any lighter, barge, boat, or vessel, of any burden or description whatsoever, used wholly on rivers or inland navigation, or vessel not duly registered according to law. Opinion of Judge DRUMMOND in *The War Eagle*, 6 Biss. 364. Surely parliament was not concerned with questions of interstate or internal commerce. To use the language of Mr. Justice BRADLEY above quoted, it was a modification of the maritime law. We have rectified that. In fact, our statute adopted the maritime law, as contradistinguished from the English statutes, with that exception, where they were followed. But in England as in this country the scope of this great privilege had been gradually but steadily extended. It was partially adopted by the act of 7 Geo. II. in 1734. It was enlarged by 26 Geo. III., 1786, and again by 53 Geo. III., 1813. In 1841, France took advanced action in behalf of the ship-owner. The act of 1851 was framed in the light thrown upon the subject by all of this European legislation, and by the writings of Grotius, (War and Peace, bk. 2, c. 11, § 13,) Valin, (*liber* 2, tit. 8,) Pardessus, (2 Droit Com. pt. 3, tit. 2, c. 3,

§ 2,) and many others,—renowned writers on maritime law. Who can doubt its wisdom or its beneficence, when considered in the light of such experience and such authority? Its philosophy is eminently practical, and is well explained by Mr. Justice Bradley, in *Norwich Co.* v. *Wright*, 13 Wall. 121:

"The great object of the law was to encourage ship-building, and to induce capitalists to invest money in this branch of industry. Unless they can be induced to do so, the shipping interests of the country must flag and decline. Those who are willing to manage and work ships are generally unable to build and fit them. They have plenty of hardiness and personal daring, and enterprise, but they have little capital. On the other hand, those who have capital, and invest it in ships, incur a very large risk in exposing their property to the hazards of the sea, and to the management of sea-faring men, without making them liable for additional losses and damage to an indefinite amount. How many enterprises in mining, manufacturing, and internal improvements would be utterly impracticable if capitalists were not encouraged to invest in them through corporate institutions, by which they are exempt from personal liability or from liability except to a limited extent! The public interests require the investment of capital in ship-building quite as much as in any of these enterprises."

Having rectified by the act of 1851 its omission to obtain the benefit of this law for the ship-owners who are our countrymen, congress, finding that it was injudicious to exclude therefrom the interests engaged in inland navigation, rectified that mistaken exclusion by the act of June 19, 1886, now under consideration. Who may successfully dispute the wisdom of this legislation? Who may deny its absolute and vital importance to the shipping interests of the country upon those northern oceans of living water,—traversed by vast fleets of steamers and sailing vessels, annually discharging into the coffers of national and individual treasure, an opulence of wealth beyond the dreams of avarice? Is it possible to question the benefit of this law, to the traffic upon those mighty streams which, with their tributaries, vitalize the continent as the arteries the human body, or upon the innumerable water-courses of lesser volume, but the value of which the nation is beginning to appreciate, and for the improvement of which the public makes annual and liberal expenditures in order to advance the commerce, which is declared in argument here, to be wholly without national control?

After consideration in detail of the reasons urged against the validity of the act,—consideration had with the carefulness and attention demanded, not alone by the great moment of the inquiry, but also by the zeal and earnestness with which the supposed encroachment upon the rights of the state has been combatted,—we are thoroughly satisfied that the legislation is proper, as well to the commercial power of congress as to the admiralty jurisdiction of the courts, as modified by the statutes. It has afforded an additional illustration of the fortunate truth that the constitution of our country is never an obstacle to the practical and patriotic assertion of national control over subjects of national concern; but considered in sympathy with the broad and patriotic, yet cautious and conservative purposes of its framers, it furnishes an undoubted warrant

for all legislation appropriate to our diverse system, and in consonance with the expension and progress of the country on the paths of civilization as they widen and extend. The demurrer will be overruled.