495 P.2d 31

**MORTON INTERNATIONAL, INC., a corporation, Plaintiff and Appellant,**

**v.**

**SOUTHERN PACIFIC TRANSPORTATION COMPANY, a corporation, Defendant and Respondent,**

**Hardy Salt Company, a corporation, Amicus Curiae,**

**Solar Salt Company, a corporation, Amicus Curiae.**

**No. 12557.**

Supreme Court of Utah.

March 14, 1972.

 

Haldor T. Benson, and James R. Am-schler, of Van Cott, Bagley, Cornwall & McCarthy, Salt Lake City, for defendant-respondent.

J. Thomas Greene, Gifford W. Price, of Cannon, Greene & Nebeker, Salt Lake City, for Hardy Salt Co.

Frank J. Allen, of Clyde, Mecham & Pratt, Salt Lake City, for Solar Salt Co., amici curiae.

HENRIOD, Justice:

Appeal from a summary judgment dismissing Morton's complaint that asked for an injunction and damage incident to the defendant railroad's construction of a rock and earth causeway across part of Great Salt Lake pursuant to an easement granted by the State of Utah for such purpose in August 1956. Affirmed with costs to the railroad.

Morton and its predecessors have diverted lake waters to capture salt in solution by evaporative precipitation, since before 1903,[1] the chop-off date after which appropriation of water for a beneficial use, had to filter through the State Engineer by formal application and hearing. Other companies, including amici curiae, Hardy Salt Co. and Solar Salt Co., enjoy similar histories. Morton's point of diversion has been and is at the south end of the lake approximately 30 miles south of the rail-

Hardin A. Whitney, Jr., and John W. Horsley, of Moyle, Whitney & Horsley, Salt Lake City, Frank A Wollaeger, and Paul D. Frenz, of McBride, Baker, Weinke & Schlosser, Chicago, Ill., for plaintiff-appellant.

1. Chap. 100, Laws of Utah 1903; Sec. 73-3, U.C.A. 1953.

road's causeway, which for practical purposes separates the lake into a North and a South lake connected only by two 15-foot openings, causing the South Lake, into which flows essentially fresh water, amounting to 90 per cent of the total intake, to be one foot higher, with a resulting flowage northward through the openings causing a dilution of salt content in the South Lake waters and a corresponding increased salinity in the North Lake waters. It is this dilution about which this litigation revolves.

The dilution mentioned allegedly commenced after the construction of the causeway and, if true, certainly after a written agreement was executed in September 1954 between Morton and the State, to settle a legal action between them, and without prejudice to each's claims. In that agreement Morton was "to have the continuing right to appropriate, remove and divert water of and from Great Salt Lake for the purpose of extracting salt therefrom, provided, however that this agreement shall not be construed to relieve Morton from full compliance with Title 73, Utah Code Annotated 1953," requiring an application and certificate to appropriate water.

The reading of defendant's brief discloses certain objections and observations that make it sound like the defendant here is the State of Utah,—such as plaintiff's failure to conform to its agreement of September 1954 mentioned above, its diligence rights in the water reserved against the State, the right of the railroad to assert defenses being that of the State, whether the railroad is engaged in a public endeavor, whether plaintiff has rights based on its failure to have made application for appropriation under Titles 73 and 65-1-15, Utah Code Annotated 1953, and the like,—all and none of which we believe to be dispositive here,—and we so hold.

What we *do* think is important and dispositive here, is the question of who owns the salt in solution in the waters of the lake. Although there was some question about this important matter before 1946, there was none thereafter, since we held in a somewhat similar case [2] that "the salt . . . is contained within Great Salt Lake, which is a navigable body of water. Because it is a navigable body of water its bed belongs to the state subject to the control of Congress for navigation in commerce. . . . It is our opinion that the state as the owner of the beds of navigable bodies of waters is entitled to all valuable minerals in or on them,"—such conclusion being affirmed and established by the U. S. Supreme Court in the most recent decision of June 6, 1971.[3] Plaintiff cites many Territorial and State statutes having to do with the right to *use* water. Its only claim

2. Deseret Livestock Co. v. State, 110 Utah 239, 171 P.2d 401 (1946).

3. Utah v. United States, 403 U.S. 9, 91 S.Ct. 1775, 29 L.Ed.2d 279 (1971).

to ownership of the salt is by "silent acquiescence" of public authorities, with resulting "riparian" rights. Such claim is without merit.[4]

■ The reason we think that ownership of the salt is of primary import here is that plaintiff asserts an ownership in the salt in solution in the waters of the lake by virtue of its continued appropriation of part thereof. This thesis does violence to the concept and authorities mentioned in the next preceding paragraph, and indulges the assumption that plaintiff not only had an ownership interest in the salt solution and the bed of the lake to the exclusion of the State as long as its agreement with the State persisted,—possibly in perpetuity according to such contract,—but as to many others having agreements with the State to divert the water and extract the salt therefrom, as prevails with respect to the amici curiae mentioned herein. It is obvious that plaintiff's right to divert and precipitate the salt is a nonexclusive right, and that no matter what you call it,—a diligence right, a license, a profit a prendre, a lease, or a contract to sell,—the right is circumscribed by the provisions of Title 65–1–15, U.C.A. 1953, reserving to the State the salt in the water, to "be *sold* by the state land board *only* upon a royalty basis." The plaintiff's agreement with the State of September 1954, among other things, provides for and requires the payment of so much per ton for salt processed.

■ The State owning the salt and plaintiff having but a nonexclusive right to extract and process it, the basic question remains as to whether construction of the railroad's causeway, which concededly diluted the water of its salt content in the so-called South Lake, created a compensable claim against the railroad in favor of plaintiff, concededly damaged in the sense that dilution of the water it diverts will cost more in the salt reduction process. We think there is no compensable claim here because plaintiff has no exclusive right against the State or others to the salt or the water from which it is converted, has no right given by the State to divert the water at any *specific* point. It can do so at any available point along the lake, either south or north of the causeway, has no vested claim to a beneficial use of the water,[5] has filed no claim for mineral rights, and could, but for the expense involved, divert water as well from any point

4. See footnotes 2 and 3.

5. Deseret Livestock Co. v. State, supra, footnote 2, where it is said "The only manner in which water can be appropriated is by being placed to a beneficial use. The use of water for the precipitation of salt is such a beneficial use, and if appellant were seeking to appropriate water to carry salt *which belonged to it*, it would be placing the water to a beneficial use . . . However, *appellant does not own the salt*."

on the lake where the salt in solution may exceed that in the South Lake.

If the plaintiff, under such circumstances had a compensable claim against the railroad, it would have a claim also against all others having contracts to divert water for salt production, such as the amici curiae here, for interference with its right to take the water from the lake. Its theory would contemplate a guaranteed mean saturation point to be accomplished by the State, by other nonexclusive diverters, administrators of waters flowing into the lake, and perhaps others, with an adjunctive either express or implied warranty by the State that the public, state-owned waters of Great Salt Lake, could be used for no purpose whatever, affecting the public weal, for private contract, leasing to others, regulation of traffic thereon by Congress, or otherwise, if the result threatened the dilution of the waters that plaintiff chooses to divert in its business. We are of the opinion that the plaintiff could not contend that the considerable rise in the lake level that has occurred in the past few years which would appear also to be dilutive of the salt water, would give rise to a compensable claim against the State.

■ The Great Salt Lake is the property of Utah subject only to regulation of navigation by Congress. The State has given the railroad a nonexclusive right to build the causeway, which right does not prevent the State from granting some other road such a right, just as it does not prevent the State from giving other persons or companies rights similar to Morton's.

■ Although plaintiff's complaint alleges it is a third-party beneficiary under the State's contract with the railroad because the easement was granted subject to a provision that the railroad would compensate surface owners and lessees for damage during construction and operation of the causeway, no point on appeal was urged for the contention that plaintiff was a "surface owner," although a point was made in essence that it was a "lessee,"—which latter we have said has no merit. We are not called upon to determine whether Morton is a "surface owner" or not, but we are constrained to observe that we think such appellation does not apply to those incidentally damaged by water dilution, but at best to damage of some tangible existing physical property or facility owned by anyone, whether he has rights to remove salt water or not.

The briefs extensively discuss contractual matters anent rights and duties between Morton and the State, which latter is no party to this litigation. We are not constrained to discuss or decide those issues here, but only between Morton and the railroad inter se. In doing so we think the summary judgment was correct. We do this being mindful of the magnitude of the

litigants' problems and interests. We would hope that if engineering-wise it would be practical and not inordinately costly, the litigants here, the amici curiae and all others having an economic interest in a constant and normal concentration of salinity in the lake, well might serve themselves and the public welfare, if somehow, they could unite in an effort to maintain the waters of the lake in their natural saline state.

CALLISTER, C. J., and TUCKETT, ELLETT, and CROCKETT, JJ., concur.