**HARDY SALT COMPANY, Plaintiff-Appellant,**

**Sanders Brine Shrimp Company, Plaintiff-Appellant,**

**Morton-Norwich Products, Inc., Plaintiff-Appellant,**

v.

**SOUTHERN PACIFIC TRANSPORTATION COMPANY, Defendant-Appellee,**

**Great Salt Lake Minerals & Chemicals Corporation, Intervenor-Defendant-Appellee.**

**Nos. 73-1714 to 73-1716.**

United States Court of Appeals, Tenth Circuit.

Argued March 19, 1974.

Decided July 26, 1974.

As Amended on Denial of Rehearing Sept. 27, 1974.

J. Thomas Greene, Salt Lake City, Utah (Gifford W. Price of Greene & Nebeker, Salt Lake City, Utah, and F. William McCalpin, St. Louis, Mo., of counsel, were on the brief), for plaintiff-appellant Hardy Salt Co.

Frank J. Allen of Clyde, Mecham & Pratt, Salt Lake City, Utah, for plaintiff-appellant Sanders Brine Shrimp Co.

Frank A. Wollaeger, Chicago, Ill. (Hardin A. Whitney and John W. Horsley of Moyle & Draper, Salt Lake City, Utah, and Paul D. Frenz of McBride, Baker, Wienke & Schlosser, Chicago, Ill., were on the brief), for plaintiff-appellant Morton-Norwich Products, Inc.

Clifford L. Ashton, Salt Lake City, Utah (Haldor T. Benson, Salt Lake City, Utah, was on the brief), for defendant-appellee Southern Pacific Transportation Co.

Claron C. Spencer, Salt Lake City, Utah (Richard G. Allen of Senior & Senior, Salt Lake City, Utah, was on the brief), for intervenor-defendant-appellee Great Salt Lake Minerals & Chemicals Corp.

Amici curiae, The United States of America and The State of Utah submitted briefs.

Before DURFEE,* Senior Judge, and HOLLOWAY and BARRETT, Circuit Judges.

HOLLOWAY, Circuit Judge.

These consolidated appeals seek reversal of a judgment of the District Court dismissing the appellants' actions for damages and injunctive relief for injuries claimed to result from the construction and operation of a causeway across the Great Salt Lake of Utah by appellee Southern Pacific Transportation Company.

In 1956 the State of Utah granted Southern Pacific an easement across the Lake for railroad purposes. In 1959 Southern Pacific completed construction of the rock and earth fill causeway which separated the northern one-third of the Lake from the southern two-thirds.

The causeway is approximately 12.8 miles in length and contains only two 15-foot culvert openings to allow for circulation between the two arms of the Lake. The total fill causeway has created a static head water surface differential between the south and north arms of the Lake, causing the water to be about 17 inches to 22 inches higher on the south than the north. The differential has caused the migration of thousands of tons of salt from the south to the north, resulting in an increasing concentration of salt in the north lake and the dilution of brines in the south lake. Approximately 95 per cent of the total water flowing into the Lake enters the south lake, further contributing to the build up of the static head differential and moving the salt northward.

Appellants Hardy Salt Company (Hardy) and Morton-Norwich Products, Inc.

* Of the United States Court of Claims, sitting by designation.

(Morton) are engaged in the business of extracting sodium chloride (salt) from the waters of the Lake. The proof of Hardy and Morton showed the following facts.

Morton and Hardy operate under royalty agreements with the State of Utah for the extraction of salt from the Lake. The processing plants and related facilities of both companies are located along what is now the south arm of the Lake. Since the brine in the south arm is becoming more dilute each year, more water must be evaporated to recover the same quantity of salt. This has required the acquisition of land for additional concentrating ponds and increased the costs of production. Essentially it is these difficulties and increased costs resulting from them that Hardy and Morton complain of.

Appellant Sanders Shrimp Company (Sanders) is in the business of harvesting brine shrimp and shrimp eggs from the Lake and selling them as tropical fish food. Sanders' proof showed the following facts.

Sanders has a 1970 ten-year contract with the Utah State Division of Fish and Game giving Sanders the full and exclusive right to seine for and harvest brine shrimp and brine shrimp eggs in two designated areas south of the causeway, it being stipulated that another company is permitted to collect up to 10,000 pounds of brine shrimp annually from one of the two areas. Also Sanders has an annual seining permit from the State.

The described changes in salinity of the two arms of the Lake have affected the brine shrimp and their eggs. With the increased salinity in the north arm, the shrimp can no longer survive there. Although the south arm provides a suitable environment, the decreased salinity has caused them to adjust the density of their eggs to the lower density of the water. More worthless egg shells are produced and there is a lessening supply of shrimp eggs available for collection by normal methods. And a lower per-

centage of the eggs which can be harvested by normal methods are viable.

Hardy and Sanders brought their suits for injunctive relief and damages in the State Court, based on claims of public and private nuisance, waste, interference with business interests and like theories. Morton brought its action in the Federal District Court, asserting only a claim under the Rivers and Harbors Act of 1899, 33 U.S.C.A. § 401 et seq. The Hardy and Sanders suits were removed to the Federal District Court on diversity grounds, and the suits were all consolidated for trial later. Hardy then also asserted a claim for relief under the Rivers and Harbors Act. Before trial appellee Great Salt Lake Minerals & Chemicals Corporation, which is engaged in recovering salt from the north arm of the Lake, was permitted to intervene as a party defendant, asserting that any significant dilution of the concentrated brine in the north arm would adversely affect its operations.

After completion of the plaintiffs' proof, Southern Pacific moved to dismiss. The District Court sustained the motion, made findings and conclusions adverse to the plaintiffs and dismissed the action.

The Court found that neither the royalty agreements between the State of Utah and Hardy and Morton, nor the seining permits granted to Sanders, purported to grant exclusive rights to remove salt or brine shrimp or shrimp eggs from the Great Salt Lake, and that the agreements did not purport to guarantee any given salinity of the waters in the entire lake or any part of it. The Court held that under Morton International, Inc. v. Southern Pacific Transportation Co., 27 Utah 2d 256, 495 P.2d 31, cert. denied, 409 U.S. 934, 93 S.Ct. 238, 34 L.Ed.2d 189, the royalty agreements held by Hardy and Morton were nonexclusive in nature, and that because of this fact neither Hardy nor Morton could recover for any damages resulting from diminution of the salt content in the south arm.

The Court concluded also that Sanders has nothing more than a nonexclusive license to fish and, therefore, under the *Morton* opinion, Sanders has no cause of action against Southern Pacific for any damages resulting from diminution of the brines of the south arm, or the strengthening of the brines of the north arm that may be due to construction of the causeway.

Hardy, Morton and Sanders all appeal. We treat first the State law claims of nuisance, waste, interference with business interests and like theories, and will later consider the Federal claims under the Rivers and Harbors Act.

1. *The State law claims of nuisance, waste, interference with business interests and like theories.*

Applying State law to the diversity claims as required by Erie R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, the District Court relied primarily on Morton International, Inc. v. Southern Pacific Transportation Co., 27 Utah 2d 256, 495 P.2d 31, cert. denied, 409 U.S. 934, 93 S.Ct. 238, 34 L.Ed.2d 189, in denying relief sought on State law claims. The case must be carefully considered.

The *Morton* case involved State law claims similar to those of Hardy and Sanders and concerned injury from the same causeway. Morton's claims were premised on "diligence rights" which are not clearly defined in the opinion. Before Utah law provided for applications for certificates for water appropriation, such as obtained by Hardy, such diligence rights described the right to take water obtained by a continued beneficial use. See Hanson v. Salt Lake City, 115 Utah 404, 205 P.2d 255; Hague v. Nephi Irrigation Co., 16 Utah 421, 52 P. 765, 768. However, the source of the right does not appear dispositive in the case. The Utah Supreme Court in fact referred to Morton's failure to have made application for appropriation of water under Titles 73 and 65–1–15, Utah Code Annotated (1953), but said that this was not dispositive. The reasons for denial of relief to Morton were spelled out by the Court as follows:

What we *do* think is important and dispositive here, is the question of who owns the salt in solution in the waters of the lake. Although there was some question about this important matter before 1946, there was none thereafter, since we held in a somewhat similar case that "the salt . . . is contained within Great Salt Lake, which is a navigable body of water. Because it is a navigable body of water its bed belongs to the state subject to the control of Congress for navigation in commerce. . . . It is our opinion that the state as the owner of the beds of navigable bodies of waters is entitled to all valuable minerals in or on them," —such conclusion being affirmed and established by the U. S. Supreme Court in the most recent decision of June 6, 1971. : . .

. . . . It is obvious that plaintiff's right to divert and precipitate the salt is a nonexclusive right, and that no matter what you call it,—a diligence right, a license, a profit a prendre, a lease, or a contract to sell, —the right is circumscribed by the provisions of Title 65–1–15, U.C.A. 1953, reserving to the State the salt in the water, to "be *sold* by the state land board *only* upon a royalty basis." The plaintiff's agreement with the State of September 1954, among other things, provides for and requires the payment of so much per ton for salt processed.

The State owning the salt and plaintiff having but a nonexclusive right to extract and process it, the basic question remains as to whether construction of the railroad's causeway, which concededly diluted the water of its salt content in the so-called South Lake, created a compensable claim against the railroad in favor of

plaintiff, concededly damaged in the sense that dilution of the water it diverts will cost more in the salt reduction process. We think there is no compensable claim here because plaintiff has no exclusive right against the State or others to the salt or the water from which it is converted, has no right given by the State to divert the water at any *specific* point. It can do so at any available point along the lake, either south or north of the causeway, has no vested claim to a beneficial use of the water, has filed no claim for mineral rights, and could, but for the expense involved, divert water as well from any point on the lake where the salt in solution may exceed that in the South Lake. 495 P.2d at 32–33.

It is thus apparent that regardless of the label of the right involved, the basic statute reserved to the State the salt and the water to "be sold by the state land board only upon a royalty basis." And since Morton could only have a nonexclusive right to take salt, it had no interest entitling it to injunctive relief or damages for injury from salinity changes resulting from the causeway.

On this appeal both Hardy and Sanders argue that for several reasons the *Morton* case does not apply. First Hardy says that the rights granted to it by the State differ sufficiently from Morton's rights to distinguish the case. Hardy's rights include: (1) certificates of water appropriation which provide that as appropriator Hardy is entitled to the use of water for diversion and use, including the certificate stating that "the water is, during the above-mentioned periods, intermittently diverted and used through evaporation of said water to yield 80,500 tons of salt each year . . ." (Hardy Exs. 87, 88); (2) a pre-causeway royalty agreement (Hardy Ex. 83); (3) a specific easement granted by the State to extract brine from the Great Salt Lake through a channel at a specific point of diversion (Hardy Ex. 82) onto ponds on its fee lands (Hardy Ex. 80) and lands leased to the company by the State (Hardy Ex. 81).

On the other hand Morton, although possessing a royalty agreement, had only diligence rights rather than a certificate like Hardy's for appropriation of water.[1] And Morton had no point of diversion specified by the State and no indication of the quantity of salt Morton could extract from the Lake.

In the *Morton* opinion the Utah Supreme Court referred, Id. at 32, to Utah Code Annotated § 65–1–15 (1953), which provides:

> Salts and other minerals in the waters of navigable lakes and streams are likewise reserved to the state and shall be sold by the state land board only upon royalty basis. The amount of such royalties and the terms of such contracts shall be determined by the board; provided, that all such contracts shall be subject to the use of the waters for public purposes, and provided further that before executing a contract which contemplates the recovery of salts and minerals from said waters, the state land board shall require evidence that an application for the appropriation of water for such purpose has been filed with the state engineer and is pending in his office.

■ We feel the statute makes clear that the basic source of both Morton's and Hardy's right to take salt is the royalty agreement, provided for by the statute. Thus the efforts to distinguish *Morton* on the basis of other agreements and circumstances are not persuasive. We feel that *Morton* simply held that because the State owned the salt and Morton had only a nonexclusive right to extract and process it under the royalty agreement recognized by the statute,

---

1. Morton did have a written agreement with the State, executed in 1954, giving it the continuing right to appropriate, remove and divert water of and from the Great Salt Lake for the purpose of extracting salt therefrom. See 495 P.2d at 32.

Morton had no interest entitling it to injunctive relief and damages.

■ Unlike Morton, Hardy does have a specific point of diversion for its water, but any person entitled to the use of water in Utah may change the place of diversion on application to the State Engineer, absent substantial impairment of vested rights. See Utah Code Annotated § 73–3–3.

Hardy points out also that the grant of easement issued by the Utah state land board to Southern Pacific provided that the ". . . grantee agrees to compensate surface owners or lessees for all damages done during construction of the railroad and during its subsequent operations." Hardy argues that it is within the class protected and benefited by the contractual obligation as an owner as well as a lessee of real property at the southern end of the Lake where its extraction facilities are located.

While Morton did not urge that proposition on its appeal to the Utah Supreme Court, this provision in the easement was considered by the Court. 495 P.2d at 34:

. . . [N]o point on appeal was urged for the contention that plaintiff was a "surface owner," although a point was made in essence that it was a "lessee,"—which latter we have said has no merit. We are not called upon to determine whether Morton is a "surface owner" or not, but we are constrained to observe that we think such appellation does not apply to those incidentally damaged by water dilution, but at best to damage of some tangible existing physical property or facility owned by anyone, whether he has rights to remove salt water or not.

■ It is clear that the statement was dictum. Nevertheless, "[t]he responsibility of the federal courts, in matters of local law, is not to formulate the legal mind of the state, but merely to ascertain and apply it." Yoder v. Nu-Enamel Corp., 117 F.2d 488, 489 (8th Cir.). Both the holdings and considered dicta of the State Courts should be applied. See Hawks v. Hamill, 288 U.S. 52, 59, 53 S.Ct. 240, 77 L.Ed. 610; Yoder v. Nu-Enamel Corp., supra, 117 F.2d at 489; Hartzler v. Chesapeake and Ohio Railway Co., 433 F.2d 104, 107 (7th Cir.). Moreover, on the unsettled peripheral questions of State law, the views of the resident District Judge are persuasive and ordinarily accepted. Sade v. Northern Natural Gas Co., 483 F.2d 230, 234 (10th Cir.); Vaughn v. Chrysler Corp., 442 F.2d 619 (10th Cir.), cert. denied, 404 U.S. 857, 92 S.Ct. 106, 30 L. Ed.2d 98; Jorgensen v. Meade Johnson Laboratories, Inc., 483 F.2d 237 (10th Cir.). Thus we are persuaded that the statement of the Utah Supreme Court calls for rejection of Hardy's contention based on the provision in the Southern Pacific easement.

■ Hardy next argues that a denial of its right to recover would be violative of the Utah Constitution and that application of the *Morton* decision to the Hardy case would be State action in violation of the United States Constitution. We find no merit to these constitutional claims. Hardy has had full access to the Federal Courts, asserting fully its State and Federal claims. The rejection of its theories was based upon a State Court decision, and we cannot say the determination denied its substantive or procedural constitutional rights.

■ Hardy argues that undue interference with its economic and business interests is actionable and that even if its rights are denominated as merely a nonexclusive privilege or license, the *Morton* decision did not reach the issue of such interference. We again must disagree. The interference with business interests was the precise injury that Morton complained of in its State Court suit. And the rejection of such claims of interference with Morton's business was based upon the principle that only a nonexclusive right to extract salt existed under the royalty agreement and § 65–1–15 of the Utah statutes providing for royalty agreements and the

taking of salt. We must agree that Hardy's rights can rise no higher since they come from the same basic source as those of Morton.

In addition, both Hardy and Sanders argue that Southern Pacific has created a public nuisance and that they may recover because of special injuries sustained as a result thereof. They say this issue was not before the Utah Supreme Court in *Morton*, and that the chemical alterations produced by the causeway violate the Utah antipollution statutes.[2]

In support of such theories, the plaintiffs' evidence showed that the ecological effects of the causeway are considerable. Prior to its construction the color of the entire lake was the same. Subsequently the north arm became reddish and the south arm green. This occurred because the increased salinity in the north lake affects aquatic life other than the brine shrimp. Blue-green algae that form algal reefs in the north lake have apparently been completely killed. Red algae have replaced the green algae in the more saline waters of the north lake as the water has approached the saturation point.

Before the causeway's construction the overall current of the Lake was counterclockwise and its specific gravity ranged from 1.17 to 1.19. After the construction the circulation in both segments of the Lake remained counterclockwise, but without exchange due to currents which previously occurred between the north and south areas. The specific gravity in the north arm now ranges from 1.21 to 1.23, which causes the salt to drop to the bottom. The specific gravity of the south arm varies from 1.09 to 1.19. Thus, while the District Court made no finding on the is-

sue, the plaintiffs' proof was substantial that Southern Pacific has caused pollution creating a public nuisance.

■■ Under Utah law the plaintiff must suffer some substantial injury or damage not inflicted on the community at large in order to recover on a public nuisance theory. Lewis v. Pingree National Bank, 47 Utah 35, 151 P. 558, 561; see also Riggins v. District Court of Salt Lake County, 89 Utah 183, 51 P. 2d 645, 662. Both Hardy and Sanders made a substantial showing of special and peculiar injuries of business interference, not common to the rest of the community. However, again the reasoning in *Morton* applies. The Utah Supreme Court referred to the change in salinity, which is the basic premise of the injury claim. "It is this dilution about which this litigation revolves." 495 P.2d at 32. While nuisance claims were not asserted or discussed, the Court held there was an absence of a protectable business interest premised on a certain salinity level in the Lake. Again we must agree with the District Court that the plaintiffs must be denied relief.

■ The claims of Sanders are likewise untenable. As stated above, it is true that under its contract with the State, Sanders does have an exclusive right to seine and harvest in two designated areas, one other company having a right to collect a limited amount of shrimp in one of the two areas. However, Sanders' rights to seine and harvest are only a right to reduce to possession and therefore are analogous to a profit a prendre and other like rights mentioned in the *Morton* opinion. 495 P.2d at 33. Again, like Morton and Hardy, Sanders' rights do not create a protectable business in-

---

**2.** Reliance is placed on §§ 73–14–2(a), 73–14–5(a) and 76–43–3(3). Section 73–14–2(a) provides:

"Pollution" means such contamination, or other alteration of the physical, chemical or biological properties, of any waters of the state, or such discharge of any liquid gaseous or solid substance into any waters

of the state as will create a nuisance or render such waters harmful or detrimental or injurious to public health, safety or welfare, or to domestic, commercial, industrial, agricultural, recreational, or other legitimate beneficial uses, or to livestock, wild animals, birds, fish or other aquatic life.

terest premised on a certain salinity level in the Lake under the reasoning of the *Morton* case. Id. It would seem that there should be relief against violation of the antipollution statute which prohibits damage to aquatic life, Utah Code Annotated § 73–14–2, which damage was shown by Sanders clearly as to its operations in the north arm of the Lake where the shrimp can no longer survive. We feel, however, that the rights of Sanders still come within the rationale of the *Morton* opinion and that the District Court did not err in deciding that Sanders lacked an enforceable right.[3]

 Hardy and Sanders also invoke Utah's private nuisance statute, Utah Code Annotated § 78–38–1, and the Utah waste statute, Utah Code Annotated § 78–38–2. On the reasoning discussed above, we must again hold that Hardy and Sanders do not demonstrate the type of a business or economic interest entitling them to relief.

In sum, we must hold that the District Court did not err in denying relief on the State law claims in light of Morton International, Inc. v. Southern Pacific Transportation Co. and the parallel circumstances involved here.

### 2. *The Federal claims under the Rivers and Harbors Act.*

In addition to the State law claims asserted by Hardy and Sanders, Hardy and Morton assert a federal claim against Southern Pacific based on alleged violation of the Rivers and Harbors Act of 1899, 33 U.S.C.A. § 401 et seq., by Southern Pacific. Specifically, they allege that Southern Pacific violated §§ 9, 10, and 13 of that Act, 33 U.S. C.A. §§ 401, 403, and 407,[4] in that the

---

3. It is true that the Utah Supreme Court did uphold the right of a private party to obtain relief against water contamination on a nuisance theory in North Point Consolidated Irrigation Co. v. Utah & Salt Lake Canal Co., 16 Utah 246, 52 P. 168. See also Reeder v. Brigham City, 17 Utah 2d 398, 413 P.2d 300. The plaintiff irrigation company complained that defendant canal and irrigation companies had no right to contaminate canal waters, thus rendering them unfit for domestic and irrigation purposes served by the plaintiff. The Court held that on the record the plaintiff was entitled to injunctive relief. However, in the opinion there is no discussion of exclusivity vel non of the plaintiff's rights. And, in any event, the recent *Morton* decision, involving the same injuries produced by the causeway, must be followed as the more compelling authority.

4. 33 U.S.C.A. § 401 provides:
 It shall not be lawful to construct or commence the construction of any bridge, dam, dike, or causeway over or in any port, roadstead, haven, harbor, canal, navigable river, or other navigable water of the United States until the consent of Congress to the building of such structures shall have been obtained and until the plans for the same shall have been submitted to and approved by the Chief of Engineers and by the Secretary of the Army: *Provided,* That such structures

may be built under authority of the legislature of a State across rivers and other waterways the navigable portions of which lie wholly within the limits of a single State, provided the location and plans thereof are submitted to and approved by the Chief of Engineers and by the Secretary of the Army before construction is commenced . . . .

33 U.S.C.A. § 403 provides:
 The creation of any obstruction not affirmatively authorized by Congress, to the navigable capacity of any of the waters of the United States is prohibited; and it shall not be lawful to build or commence the building of any wharf, pier, dolphin, boom, weir, breakwater, bulkhead, jetty, or other structures in any port, roadstead, haven, harbor, canal, navigable river, or other water of the United States, outside established harbor lines, or where no harbor lines have been established, except on plans recommended by the Chief of Engineers and authorized by the Secretary of the Army; and it shall not be lawful to excavate or fill, or in any manner to alter or modify the course, location, condition, or capacity of, any port, roadstead, haven, harbor, canal, lake harbor of refuge, or inclosure within the limits of any breakwater, or of the channel of any navigable water of the United States, unless the work has been recommended by the Chief of Engineers and authorized by the Secre-

Railroad never received the consent of Congress or, alternatively, of the legislature of the State of Utah, nor any authorization or approval from the Secretary of the Army or the Chief of Engineers, for construction or maintenance of its causeway as those provisions variously require. The record establishes that such approvals and authorizations were not obtained (R. 443–46, 597, 1288–92). Although the Rivers and Harbors Act does not expressly create private causes for those injured by its violations, Hardy and Morton argue that such a cause of action should be implied in their favor, entitling them to injunctive relief and damages.

Southern Pacific and the Intervenor, Great Salt Lake Minerals & Chemicals Corporation, contend that the Rivers and Harbors Act does not apply because the Great Salt Lake is not a "navigable water of the United States" within the terms of that Act. They further argue that, even if the Rivers and Harbors Act applies, Hardy and Morton have no standing to complain of the violations alleged and that no private right of action may be implied under the Act in favor of Hardy and Morton since their claims are unrelated to interference with rights of navigation and are thus beyond the special federal interest and protection afforded by the Act. Finally, Southern Pacific says that, in any event, the judgment in Morton International, Inc. v. Southern Pacific Transportation Co., supra, bars the federal claim of Morton under the Act, arguing that Morton has attempted to split its cause of action related to injury from the causeway.

At trial Morton offered in evidence newspaper articles as ancient documents in support of its claim that the Great Salt Lake is a "navigable water of the United States." (Ex. M–28 through M–34). These articles, published in the late 1800's, described a flow of commercial navigation across the Lake up the Bear River to Corinne, Utah, an important rail center at the time. Although the Bear River flows interstate, no offer of proof was made to the effect that it was navigable interstate. Instead, Hardy and Morton say that they proved that the Great Salt Lake is a navigable water of the United States by demonstrating that it served as a link in the conduct of interstate commerce, namely as a conduit for the transport of goods which were subsequently shipped interstate via rail from Corinne. The District Court refused to admit the proffered newspaper articles (Tr. 585) and indicated that it would not consider proof that the Bear River was navigable (Tr. 575).

The District Court took judicial notice that the Bear River is not navigable by its findings of fact. The Court's conclusions of law stated that the Great Salt Lake is a navigable body of water of the State of Utah; that as such, the Rivers and Harbors Act is not applicable to the Great Salt Lake; and that the bed of the Lake and the waters over the said bed and the minerals contained in said waters belong to the State of Utah. Ac-

---

tary of the Army prior to beginning the same.

33 U.S.C.A. § 407 provides:

It shall not be lawful to throw, discharge, or deposit, or cause, suffer, or procure to be thrown, discharged, or deposited either from or out of any ship, barge, or other floating craft of any kind, or from the shore, wharf, manufacturing establishment, or mill of any kind, any refuse matter of any kind or description whatever other than that flowing from streets and sewers and passing therefrom in a liquid state, into any navigable water of the United States, or into any tributary of any navigable water from which the same shall float or be washed into such navigable water; . . . *And provided further*, That the Secretary of the Army, whenever in the judgment of the Chief of Engineers anchorage and navigation will not be injured thereby, may permit the deposit of any material above mentioned in navigable waters, within limits to be defined and under conditions to be prescribed by him, provided application is made to him prior to depositing such material; and whenever any permit is so granted the conditions thereof shall be strictly complied with, and any violation thereof shall be unlawful.

cordingly, the Court dismissed Hardy's and Morton's claims under the Act with prejudice.

On this appeal Hardy and Morton both contend that the District Court erred in excluding the exhibits showing the navigation to Corinne; that the Court should have admitted the proof and found that the Great Salt Lake is a navigable water of the United States under the Act; and they ask that the judgment be reversed and the case remanded for further trial.

 We must consider the exclusion of the offer of proof of navigation across the Lake and up the Bear River to the railhead at Corinne. More specifically, our question is whether there was a showing attempted that could properly establish the Great Salt Lake is a navigable water of the United States within the meaning of the Rivers and Harbors Act. We feel that the proof should have been admitted and considered on this issue. Nevertheless, we conclude that there was no reversible error, since the proof offered showed only a connection with the railhead and not with navigable interstate waters and, therefore, as a matter of law, could not establish that the Lake is a "navigable water of the United States" within the meaning of the Act.

The phrase "navigable water of the United States" has been used by Congress in several statutes prior to the 1899 Act, e. g., Act of July 7, 1838, ch. 191, 5 Stat. 304; Act of September 19, 1890, ch. 907, §§ 6–8, 26 Stat. 453–454. The term, as used in the Act of 1838, cited above, was defined in The Daniel Ball, 77 U.S. (10 Wall.) 557, 563, 19 L. Ed. 999 (1870). The Supreme Court there stated that:

. . . Those rivers must be regarded as public navigable rivers in law which are navigable in fact. And they are navigable in fact when they are used, or are susceptible of being used, in their ordinary condition, as highways for commerce, over which trade and travel are or may be conducted in the customary modes of trade and travel on water. And they constitute navigable waters of the United States within the meaning of the acts of Congress, in contradistinction from the navigable waters of the States, when they form in their ordinary condition *by themselves, or by uniting with other waters, a continued highway over which commerce is or may be carried on with other States or foreign countries in the customary modes in which such commerce is conducted by water.* (Emphasis added) See also The Montello, 78 U.S. (11 Wall.) 411, 415, 20 L.Ed. 191 (1870); and Escanaba Co. v. Chicago, 107 U.S. 678, 682, 2 S.Ct. 185, 27 L.Ed. 442 (1882).

Although the definition of "navigability" laid down in The Daniel Ball has subsequently been modified and clarified, see, e. g., The Montello, 87 U.S. (20 Wall.) 430, 22 L.Ed. 391 (1874); Leovy v. United States, 177 U.S. 621, 20 S.Ct. 797, 44 L.Ed. 914 (1900); Economy Light & Power Co. v. United States, 256 U.S. 113, 41 S.Ct. 409, 65 L.Ed. 847 (1921); United States v. Appalachian Electric Power Co., 311 U.S. 377, 61 S. Ct. 291, 85 L.Ed. 243 (1940), its definition of "navigable water of the United States," insofar as it requires a navigable interstate linkage by water, appears to remain unchanged. See Economy Light & Power Co. v. United States, supra, 256 U.S. at 121–124, 41 S.Ct. 409; United States v. Utah, 283 U.S. 64, 75, 51 S.Ct. 438, 75 L.Ed. 844 (1931); United States v. Crow, Pope & Land Enterprises, Inc., 340 F.Supp. 25, 31–36 (N.D.Ga.1972), appeal dismissed, 474 F. 2d 200 (5th Cir. 1973). Cf. the recent cases which have uniformly refused to find landlocked intrastate lakes navigable waters of the United States within the admiralty jurisdiction. Doran v. Lee, 287 F.Supp. 807 (W.D.Pa.1968); In re Builders Supply Company, 278 F. Supp. 254 (N.D.Iowa 1968) (and cases therein cited). Cf. also Johnson v. Wurthman, 227 F.Supp. 135 (D.Or.1964) (reaching similar result, but purportedly under the commerce clause).

██ We realize that the construction of "navigable water of the United States" made in The Daniel Ball and The Montello may be viewed as involving a statute depending on the admiralty power, while the Rivers and Harbors Act is an exercise of power under the commerce clause. See United States v. Crow, Pope & Land Enterprises, Inc., supra. Nevertheless, The Daniel Ball was a landmark decision and its interpretation of "navigable water of the United States," adhered to in The Montello and Escanaba Co. v. Chicago, supra, was well settled at the time of the enactment of the 1899 statute. It was the interpretation given to "navigable water of the United States" as used in the 1890 Rivers & Harbors Act, a predecessor of the 1899 Act, see 21 Op.Att'y Gen. 430, 432–33 (1896). When Congress uses words in a statute without defining them, and those words have a judicially settled meaning, it is presumed that Congress intended them to have that meaning in the statute. E. g., Case v. Los Angeles Lumber Co., 308 U. S. 106, 115, 60 S.Ct. 1, 84 L.Ed. 110 (1939); The "Abbotsford," 98 U.S. 440, 444, 25 L.Ed. 198 (1878). We may assume that the Congress was aware of these decisions and of the interpretation which they had placed upon the phrase "navigable water of the United States" so that if it had intended the Act of 1899 to employ a broader definition, it would have manifested such an intention by clear and explicit language. See Cummings v. Chicago, 188 U.S. 410, 430, 23 S.Ct. 472, 47 L.Ed. 525 (1903); compare Federal Power Act § 3(8), 16 U.S.C.A. § 796(8); Act of February 4, 1887, ch. 104, 24 Stat. 379. In the absence of any such language it should not be assumed that any such departure was intended.

We are aware, however, of the dictum in The Katie, 40 F. 480 (S.D.Ga.1889), affirmed sub nom In re Garnett, 141 U. S. 1, 11 S.Ct. 840, 35 L.Ed. 631 (1891), which appears to adopt a broader interpretation of navigable waters, lending support to the position of Hardy and Morton. The trial court there stated that if navigable waters lying wholly within a State are utilized under common control in connection with railroads for continuous carriage in interstate commerce, they would become public waters of the United States, subject to congressional control under the commerce clause. 40 F. at 489.

The dictum was not discussed by the Supreme Court opinion affirming the decision and no subsequent case has been found which refers to it. In these circumstances, we feel that the predominant interpretation was that settled in the Supreme Court's decisions in The Daniel Ball and cases following it.

Hardy and Morton contend that the first proviso in Section 9 of the Act, 33 U.S.C.A. § 401, which speaks in terms of "waterways the navigable portions of which lie wholly within the limits of a single State," indicates a congressional intent to give a broad definition to navigable water of the United States, one which would clearly encompass the Great Salt Lake. We believe that the more reasonable construction of this provision is that it refers to waters which fall within the definition laid down in The Daniel Ball, but which lie wholly within a single State. In light of the history behind the Act, it seems more likely that this proviso was intended to make clear the limits of the concurrent authority of the States over navigable waters of the United States, as defined by The Daniel Ball, than to expand the scope of the definition of "navigable water of the United States" as used in the Act. See Lake Shore & Michigan Southern Railway Co. v. Ohio, 165 U.S. 365, 17 S.Ct. 357, 41 L.Ed. 747 (1897); Cummings v. Chicago, 188 U.S. 410, 23 S.Ct. 472, 47 L.Ed. 525 (1903).

Hardy and Morton also contend that the decree entered in the case of Utah v. United States, 406 U.S. 484, 92 S.Ct. 1691, 32 L.Ed.2d 246 (1972) [5] supports

___

5. See also the proposed decree appended to the decision in Utah v. United States, 403

U.S. 9, 13, 91 S.Ct. 1775, 29 L.Ed.2d 279 (1971).

their contention that the Great Salt Lake is a navigable water of the United States.[6] We do not agree. On its face the decree does nothing more than acknowledge the potential possibility of regulation of commerce on the Great Salt Lake. It contains no implication whatsoever that the Congress has already chosen to regulate the Lake under the Rivers and Harbors Act.

▬▬ We conclude that a navigable water of the United States within the meaning of Sections 9, 10 and 13 of the Rivers and Harbors Act must be construed in line with the interpretation in The Daniel Ball, as contemplating such a body of water forming a continued highway over which commerce is or may be carried on with other states or foreign countries, by water. Thus we must hold that the District Court did not err in dismissing the federal claims of Hardy and Morton founded on the Act. Their offer of proof was insufficient to demonstrate that the Great Salt Lake is a navigable water of the United States within the meaning of the statute, showing only navigability within Utah to the railhead.

We feel we should not rest our decision on the broader views on the Rivers and Harbors issue expressed in the District Court's conclusions of law, and limit our decision as stated herein.[7] We need not and do not decide whether the Lake could be shown to be such a navigable water under the Act by other proof in another case. And we need not and do no decide whether the Congress could constitutionally regulate commerce on the Lake. Finally, deciding this case as we do on the issue of whether the Lake is a navigable water of the United States, we do not reach the other points raised by the parties on this claim and we express no opinion on them.

Concluding that the District Court committed no reversible error in the dismissal of the federal claims under the Act, or in dismissal of the State law claims discussed earlier, the judgment is affirmed.

---

6. That decree provides in pertinent part:

The United States of America, its departments and agencies are enjoined, *subject to any regulation which the Congress may impose, such as in the interest of navigation or pollution control*, from asserting against the State of Utah any claim of right, title, and interest:

(a) to the bed of the Great Salt Lake . . . . (Emphasis added)

7. We believe it was error for the District Court to find, by judicial notice, that the Bear River is not navigable, in view of the offer of proof on navigability up to Corinne. However, in view of the insufficiency of the proof offered, as discussed above, no question of fact or law on the navigability of the Bear River requires consideration.